# HORTONVILLE JOINT SCHOOL DISTRICT NO. 1 ET AL. *v.* HORTONVILLE EDUCATION ASSN. ET AL.

No. 74–1606.   Argued February 23–24, 1976—Decided June 17, 1976

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. STEWART, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 497.

*Jack D. Walker* argued the cause for petitioners. With him on the briefs were *James K. Ruhly* and *Joseph A. Melli.*

*Robert H. Friebert* argued the cause for respondents. With him on the brief was *Thomas W. St. John.*\*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari in this case to determine whether School Board members, vested by state law with the

---

\*Briefs of *amici curiae* urging reversal were filed by *James F. Clark* and *Karen A. Mercer* for the Wisconsin Association of School Boards, Inc.; by *Leon Fieldman* for the National School Boards Assn.; by *Robert T. Thompson, Lawrence Kraus,* and *Richard B. Berman* for the Chamber of Commerce of the United States; and by *Jerome T. Foerster* for the Pennsylvania School Boards Assn.

*Michael H. Gottesman, Robert M. Weinberg,* and *David Rubin* filed a brief for the National Education Assn. as *amicus curiae* urging affirmance.

*John E. Murray* filed a brief for the County of Broome, State of New York, as *amicus curiae.*

power to employ and dismiss teachers, could, consistent with the Due Process Clause of the Fourteenth Amendment, dismiss teachers engaged in a strike prohibited by state law.

## I

The petitioners are a Wisconsin school district, the seven members of its School Board, and three administrative employees of the district. Respondents are teachers suing on behalf of all teachers in the district and the Hortonville Education Association (HEA), the collective-bargaining agent for the district's teachers.

During the 1972–1973 school year Hortonville teachers worked under a master collective-bargaining agreement; negotiations were conducted for renewal of the contract, but no agreement was reached for the 1973–1974 school year. The teachers continued to work while negotiations proceeded during the year without reaching agreement. On March 18, 1974, the members of the teachers' union went on strike, in direct violation of Wisconsin law. On March 20, the district superintendent sent all teachers a letter inviting them to return to work; a few did so. On March 23, he sent another letter, asking the 86 teachers still on strike to return, and reminding them that strikes by public employees were illegal; none of these teachers returned to work. After conducting classes with substitute teachers on March 26 and 27, the Board decided to conduct disciplinary hearings for each of the teachers on strike. Individual notices were sent to each teacher setting hearings for April 1, 2, and 3.

On April 1, most of the striking teachers appeared before the Board with counsel. Their attorney indicated that the teachers did not want individual hearings, but preferred to be treated as a group. Although counsel agreed that the teachers were on strike, he raised several procedural objections to the hearings. He

also argued that the Board was not sufficiently impartial to exercise discipline over the striking teachers and that the Due Process Clause of the Fourteenth Amendment required an independent, unbiased decisionmaker. An offer of proof was tendered to demonstrate that the strike had been provoked by the Board's failure to meet teachers' demands, and respondents' counsel asked to cross-examine Board members individually. The Board rejected the request, but permitted counsel to make the offer of proof, aimed at showing that the Board's contract offers were unsatisfactory, that the Board used coercive and illegal bargaining tactics, and that teachers in the district had been locked out by the Board.

On April 2, the Board voted to terminate the employment of striking teachers, and advised them by letter to that effect. However, the same letter invited all teachers on strike to reapply for teaching positions. One teacher accepted the invitation and returned to work; the Board hired replacements to fill the remaining positions.

Respondents then filed suit against petitioners in state court, alleging, among other things, that the notice and hearing provided them by the Board were inadequate to comply with due process requirements. The trial court granted the Board's motion for summary judgment on the due process claim. The court found that the teachers, although on strike, were still employees of the Board under Wisconsin law and that they retained a property interest in their positions under this Court's decisions in *Perry* v. *Sindermann,* 408 U. S. 593 (1972), and *Board of Regents* v. *Roth,* 408 U. S. 564 (1972). The court concluded that the only question before the Board on April 1 and 2 was whether the teachers were on strike in violation of state law, and that no evidence in mitigation was relevant. It rejected their claim that they were denied due process, since the teachers admitted they were on strike after receiving adequate notice and a hearing,

including the warning that they were in violation of Wisconsin law.

On appeal, the Wisconsin Supreme Court reversed, 66 Wis. 2d 469, 225 N. W. 2d 658 (1975). On the single issue now presented it held that the Due Process Clause of the Fourteenth Amendment to the Federal Constitution required that the teachers' conduct and the Board's response be evaluated by an impartial decisionmaker other than the Board. The rationale of the Wisconsin Supreme Court appears to be that although the teachers had admitted being on strike, and although the strike violated Wisconsin law, the Board had available other remedies than dismissal, including an injunction prohibiting the strike, a call for mediation, or continued bargaining. Relying on our holding in *Morrissey* v. *Brewer,* 408 U. S. 471 (1972), the Wisconsin court then held "it would seem essential, even in cases of undisputed or stipulated facts, that an impartial decision maker be charged with the responsibility of determining what action shall be taken on the basis of those facts." 66 Wis. 2d, at 493, 225 N. W. 2d, at 671. The court held that the Board was not sufficiently impartial to make this choice: "The background giving rise to the ultimate facts in this case reveals a situation not at all conducive to detachment and impartiality on the part of the school board." *Ibid.* In reaching its conclusion, the court acknowledged that the Board's decision could be reviewed in other forums; but no reviewing body would give the teachers an opportunity to demonstrate that "another course of action such as mediation, injunction, continued collective bargaining or arbitration would have been a more reasonable response on the part of the decision maker." *Id.,* at 496, 225 N. W. 2d, at 672.

Since it concluded that state law provided no adequate remedy, the Wisconsin Supreme Court fashioned one it thought necessary to comply with federal due process

principles. To leave with the Board "[a]s much control as possible . . . to set policy and manage the school," the court held that the Board should after notice and hearing make the decision to fire in the first instance. A teacher dissatisfied with the Board's decision could petition any court of record in the county for a *de novo* hearing on *all* issues; the trial court would "resolve any factual disputes and provide for a reasonable disposition." *Id.,* at 498, 225 N. W. 2d, at 673. The Wisconsin Supreme Court recognized that this remedy was "not ideal because a court may be required to make public policy decisions that are better left to a legislative or adminis-trative body." *Ibid.* But it would suffice "until such time and only until such time as the legislature provides a means to establish a forum that will meet the require-ments of due process." *Ibid.*

We granted certiorari because of the state court's re-liance on federal due process. 423 U. S. 821 (1975). We reverse.

## II

The Hortonville School District is a common school district under Wisconsin law, financed by local property taxes and state school aid and governed by an elected seven-member School Board. Wis. Stat. Ann. §§ 120.01, 120.03, 120.06 (1973). The Board has broad power over "the possession, care, control and management of the property and affairs of the school district." § 120.12 (1); see also §§ 120.08, 120.10, 120.15–120.17. The Board negotiates terms of employment with teachers under the Wisconsin Municipal Employment Relations Act, § 111.70 *et seq.* (1974), and contracts with individual teachers on behalf of the district. The Board is the only body vested by statute with the power to employ and dismiss teachers. § 118.22 (2).[1]

---

[1] The National School Boards Association informs us that 45 States

The sole issue in this case is whether the Due Process Clause of the Fourteenth Amendment prohibits this School Board from making the decision to dismiss teachers admittedly engaged in a strike and persistently refusing to return to their duties.[2] The Wisconsin Supreme Court held that state law prohibited the strike and that termination of the striking teachers' employment was within the Board's statutory authority. 66 Wis. 2d, at 479–481, 225 N. W. 2d, at 663–665. We are, of course, bound to accept the interpretation of Wisconsin law by the highest court of the State. *Groppi* v. *Wisconsin,* 400 U. S. 505, 507 (1971); *Kingsley Pictures Corp.* v. *Regents,* 360 U. S. 684, 688 (1959). The only decision remaining for the Board therefore involved the exercise of its discretion as to what should be done to carry out the duties the law placed on the Board.

---

lodge the power to dismiss teachers in local school boards. Brief as *Amicus Curiae* 9 n. 4.

[2] The Wisconsin Supreme Court held that the discharge of the teachers during their 1973–1974 individual contracts, and the revocation of the Board's individual offers of employment for the 1974–1975 school year, deprived them of property. 66 Wis. 2d 469, 489, 225 N. W. 2d 658, 669 (1975). "Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. . . ." *Board of Regents* v. *Roth,* 408 U. S. 564, 577 (1972). We do not challenge the Wisconsin Supreme Court's conclusion that state law gave these teachers a "legitimate claim of entitlement to job tenure." *Perry* v. *Sindermann,* 408 U. S. 593, 602 (1972).

We are not required to determine whether the notice and hearing afforded by the Board, as matters separate from the Board's ability fairly to decide the issue before it, were adequate to afford respondents due process. Respondents do not suggest here that the notice they received was constitutionally inadequate, and they refused to treat the dismissals on a case-by-case basis.

## A

Respondents argue, and the Wisconsin Supreme Court held, that the choice presented for the Board's decision is analogous to that involved in revocation of parole in *Morrissey* v. *Brewer, supra,* that the decision could be made only by an impartial decisionmaker, and that the Board was not impartial. In *Morrissey* the Court considered a challenge to state procedures employed in revoking the parole of state prisoners. There we noted that the parole revocation decision involved two steps: First, an inquiry whether the parolee had in fact violated the conditions of his parole; second, determining whether the violations found were serious enough to justify revocation of parole and the consequent deprivation of the parolee's conditional liberty. With respect to the second step, the Court observed:

> "The second question involves the application of expertise by the parole authority in making a prediction as to the ability of the individual to live in society without committing antisocial acts. This part of the decision, too, depends on facts, and therefore it is important for the board to know not only that some violation was committed but also to know accurately how many and how serious the violations were. Yet this second step, deciding what to do about the violation once it is identified, is not purely factual but also predictive and discretionary." 408 U. S., at 480.

Nothing in this case is analogous to the first step in *Morrissey,* since the teachers admitted to being on strike. But respondents argue that the School Board's decision in this case is, for constitutional purposes, the same as the second aspect of the decision to revoke parole. The Board cannot make a "reasonable" decision on this issue, the Wisconsin Supreme Court held and respondents ar-

gue, because its members are biased in some fashion that the due process guarantees of the Fourteenth Amendment prohibit.[3]

*Morrissey* arose in a materially different context. We recognized there that a parole violation could occur at a place distant from where the parole revocation decision would finally be made; we also recognized the risk of factual error, such as misidentification. To minimize this risk, we held: "[D]ue process requires that after the

[3] Respondents argue that the requirement that the Board's decision be "reasonable" is in fact a requirement of state law. From that premise and from the premise that the "reasonableness" determination requires an evaluation of the Board's negotiating stance, they argue that nothing but decision and review *de novo* by an "uninvolved" party will secure their right to a "reasonable" decision. See *Withrow* v. *Larkin,* 421 U. S. 35, 58–59, n. 25 (1975). It is clear, however, that the Wisconsin Supreme Court held that the Board's decision must be "reasonable," not by virtue of state law, but because of its reading of the Due Process Clause of the Fourteenth Amendment. First, the Wisconsin court relied largely upon cases interpreting the Federal Constitution in this aspect of its holding. See 66 Wis. 2d, at 493, 225 N. W. 2d, at 671. Second, the only state case the Wisconsin Supreme Court cited for more than a general statement of federal requirements was *Durkin* v. *Board of Police & Fire Comm'rs,* 48 Wis. 2d 112, 180 N. W. 2d 1 (1970). There the Wisconsin Supreme Court interpreted a state statute that gave firemen and policemen the right to appeal a decision of the Board of Police and Fire Commissioners to a state court; the statute expressly provided that the court was to determine whether "upon the evidence the order of the Board was reasonable." *Id.,* at 117, 180 N. W. 2d, at 3. See Wis. Stat. Ann. § 62.13 (5) (h) (1957). There is no comparable statutory provision giving teachers the right to review this standard. Finally, to impose a "reasonableness" requirement, or any other test that looks to evaluation by another entity, makes semantic sense only where review is contemplated by the statute. Review, and the standard for review, are concepts that go hand in hand. The Wisconsin Supreme Court concluded both that review of the Board's decision was necessary and that a "reasonableness" standard was appropriate as a result of its reading of the Due Process Clause of the Fourteenth Amendment.

arrest [for parole violation], the determination that reasonable ground exists for revocation of parole should be made by someone not directly involved in the case." *Id.,* at 485. But this holding must be read against our earlier discussion in *Morrissey* of the parole officer's role as counselor for and confidant of the parolee; it is this same officer who, on the basis of preliminary information, decides to arrest the parolee. A school board is not to be equated with the parole officer as an arresting officer; the school board is more like the parole board, for it has ultimate plenary authority to make its decisions derived from the state legislature. General language about due process in a holding concerning revocation of parole is not a reliable basis for dealing with the School Board's power as an employer to dismiss teachers for cause. We must focus more clearly on, first, the nature of the bias respondents attribute to the Board, and, second, the nature of the interests at stake in this case.

### B

Respondents' argument rests in part on doctrines that have no application to this case. They seem to argue that the Board members had some personal or official stake in the decision whether the teachers should be dismissed, comparable to the stake the Court saw in *Tumey* v. *Ohio,* 273 U. S. 510 (1927), or *Ward* v. *Village of Monroeville,* 409 U. S. 57 (1972); see also *Gibson* v. *Berryhill,* 411 U. S. 564 (1973), and that the Board has manifested some personal bitterness toward the teachers, aroused by teacher criticism of the Board during the strike, see, *e. g., Taylor* v. *Hayes,* 418 U. S. 488 (1974); *Mayberry* v. *Pennsylvania,* 400 U. S. 455 (1971). Even assuming that those cases state the governing standards when the decisionmaker is a public employer dealing with employees, the teachers did not show, and the Wisconsin courts did not find, that the Board mem-

bers had the kind of personal or financial stake in the decision that might create a conflict of interest, and there is nothing in the record to support charges of personal animosity. The Wisconsin Supreme Court was careful "not to suggest . . . that the board members were anything but dedicated public servants, trying to provide the district with quality education . . . within its limited budget." 66 Wis. 2d, at 494, 225 N. W. 2d, at 671. That court's analysis would seem to be confirmed by the Board's repeated invitations for striking teachers to return to work, the final invitation being contained in the letter that notified them of their discharge.[4]

The only other factor suggested to support the claim of bias is that the School Board was involved in the negotiations that preceded and precipitated the striking teachers' discharge. Participation in those negotiations was a statutory duty of the Board. The Wisconsin Supreme Court held that this involvement, without more,

---

[4] Respondents alleged before the Board, and argue here, that the Board's decision to dismiss them was motivated by antiunion animus in addition to personal vindictiveness, and that their illegal strike should be excused because the Board provoked it. The Wisconsin Supreme Court suggested that the Board's "decision to discharge was possibly a convenient alternative which would eliminate their labor problems in one fell swoop." 66 Wis. 2d, at 494, 225 N. W. 2d, at 671. Given that Wisconsin statutes permitted the Board to dismiss striking teachers, and assuming, as did the Wisconsin court, that the Board's decision was in other respects proper under state labor law, we do not agree that federal due process prevented the Board from pursuing a course of action that was within its explicit statutory authority and which, in its judgment, would serve the best interests of the school system. That the result may also have been desirable for other reasons is irrelevant to the due process issue on which the Wisconsin Supreme Court's decision turned, and if the other reasons are invalid under state law, respondents can resort to whatever forum the State provides.

disqualified the Board from deciding whether the teachers should be dismissed:

> "The board was the collective bargaining agent for the school district and thus was engaged in the collective bargaining process with the teachers' representative, the HEA. It is not difficult to imagine the frustration on the part of the board members when negotiations broke down, agreement could not be reached and the employees resorted to concerted activity. . . . They were . . . not uninvolved in the events which precipitated decisions they were required to make." *Id.*, at 493–494, 225 N. W. 2d, at 671.

Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not, however, disqualify a decisionmaker. *Withrow* v. *Larkin,* 421 U. S. 35, 47 (1975); *FTC* v. *Cement Institute,* 333 U. S. 683, 700–703 (1948). Nor is a decisionmaker disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not "capable of judging a particular controversy fairly on the basis of its own circumstances." *United States* v. *Morgan,* 313 U. S. 409, 421 (1941); see also *FTC* v. *Cement Institute, supra,* at 701.

Respondents' claim and the Wisconsin Supreme Court's holding reduce to the argument that the Board was biased because it negotiated with the teachers on behalf of the school district without reaching agreement and learned about the reasons for the strike in the course of negotiating. From those premises the Wisconsin court concluded that the Board lost its statutory power to determine that the strike and persistent refusal to terminate it amounted to conduct serious enough to warrant discharge of the strikers. Wisconsin statutes

vest in the Board the power to discharge its employees, a power of every employer, whether it has negotiated with the employees before discharge or not. The Fourteenth Amendment permits a court to strip the Board of the otherwise unremarkable power the Wisconsin Legislature has given it only if the Board's prior involvement in negotiating with the teachers means that it cannot act consistently with due process.

## C

Due process, as this Court has repeatedly held, is a term that "negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895 (1961). Determining what process is due in a given setting requires the Court to take into account the individual's stake in the decision at issue as well as the State's interest in a particular procedure for making it. See *Mathews* v. *Eldridge,* 424 U. S. 319 (1976); *Arnett* v. *Kennedy,* 416 U. S. 134, 168 (1974) (POWELL, J., concurring); *id.,* at 188 (WHITE, J., concurring and dissenting); *Goldberg* v. *Kelly,* 397 U. S. 254, 263–266 (1970). Our assessment of the interests of the parties in this case leads to the conclusion that this is a very different case from *Morrissey* v. *Brewer,* and that the Board's prior role as negotiator does not disqualify it to decide that the public interest in maintaining uninterrupted classroom work required that teachers striking in violation of state law be discharged.

The teachers' interest in these proceedings is, of course, self-evident. They wished to avoid termination of their employment, obviously an important interest, but one that must be examined in light of several factors. Since the teachers admitted that they were engaged in a work stoppage, there was no possibility of an erroneous factual determination on this critical threshold issue. Moreover,

what the teachers claim as a property right was the expectation that the jobs they had left to go and remain on strike in violation of law would remain open to them. The Wisconsin court accepted at least the essence of that claim in defining the property right under state law, and we do not quarrel with its conclusion. But even if the property interest claimed here is to be compared with the liberty interest at stake in *Morrissey,* we note that both "the risk of an erroneous deprivation" and "the degree of potential deprivation" differ in a qualitative sense and in degree from those in *Morrissey. Mathews* v. *Eldridge, supra,* at 341.

The governmental interests at stake in this case also differ significantly from the interests at stake in *Morrissey.* The Board's decision whether to dismiss striking teachers involves broad considerations, and does not in the main turn on the Board's view of the "seriousness" of the teachers' conduct or the factors they urge mitigated their violation of state law. It was not an adjudicative decision, for the Board had an obligation to make a decision based on its own answer to an important question of policy: What choice among the alternative responses to the teachers' strike will best serve the interests of the school system, the interests of the parents and children who depend on the system, and the interests of the citizens whose taxes support it? The Board's decision was only incidentally a disciplinary decision; it had significant governmental and public policy dimensions as well. See Summers, Public Employee Bargaining: A Political Perspective, 83 Yale L. J. 1156 (1974).

State law vests the governmental, or policymaking, function exclusively in the School Board and the State has two interests in keeping it there. First, the Board is the body with overall responsibility for the governance of the school district; it must cope with the myriad day-

to-day problems of a modern public school system including the severe consequences of a teachers' strike; by virtue of electing them the constituents have declared the Board members qualified to deal with these problems, and they are accountable to the voters for the manner in which they perform.   Second, the state legislature has given to the Board the power to employ and dismiss teachers, as a part of the balance it has struck in the area of municipal labor relations; altering those statutory powers as a matter of federal due process clearly changes that balance.   Permitting the Board to make the decision at issue here preserves its control over school district affairs, leaves the balance of power in labor relations where the state legislature struck it, and assures that the decision whether to dismiss the teachers will be made by the body responsible for that decision under state law.[5]

## III

Respondents have failed to demonstrate that the decision to terminate their employment was infected by the sort of bias that we have held to disqualify other decisionmakers as a matter of federal due process.   A

[5] Respondents argue that the School Board is free to defend its action in the *de novo* hearing authorized by the Wisconsin Supreme Court by attempting to demonstrate that policy considerations dictated its decision to dismiss the striking teachers.   Policymaking is a process of prudential judgment, and we are not prepared to say that a judge can generally make a better policy judgment or, in this case, as good a judgment as the School Board, which is intimately familiar with all the needs of the school district, or that a school board must, at the risk of suspending school operations, wend its way through judicial processes not mandated by the legislature. More important, no matter what arguments the Board may make to the *de novo* trial judge, as we noted earlier it will be the School Board that will have to cope with the consequences of the decision and be responsible to the electorate for it.   The privilege of oral argument to a judge is no substitute for the power to employ and dismiss vested by statute exclusively in the Board.

showing that the Board was "involved" in the events preceding this decision, in light of the important interest in leaving with the Board the power given by the state legislature, is not enough to overcome the presumption of honesty and integrity in policymakers with decisionmaking power. Cf. *Withrow* v. *Larkin,* 421 U. S., at 47. Accordingly, we hold that the Due Process Clause of the Fourteenth Amendment did not guarantee respondents' that the decision to terminate their employment would be made or reviewed by a body other than the School Board.

The judgment of the Wisconsin Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

The issue in this case is whether the discharge of the respondent teachers by the petitioner School Board violated the Due Process Clause of the Fourteenth Amendment because the Board members were not impartial decisionmakers. It is now well established that "a biased decisionmaker [is] constitutionally unacceptable [and] 'our system of law has always endeavored to prevent even the probability of unfairness.' " *Withrow* v. *Larkin,* 421 U. S. 35, 47, quoting *In re Murchison,* 349 U. S. 133, 136.

In order to ascertain whether there is a constitutionally unacceptable danger of partiality, both the nature of the particular decision and the interest of the decisionmaker in its outcome must be examined. Here, Wisconsin law controls the factors that must be found before a teacher may be discharged for striking. The parties present sharply divergent views of what the Wisconsin law requires. The petitioners claim that the decision to

discharge a striking teacher is a policy matter entrusted to the discretion of the local school board, whereas the respondents contend that a striking teacher cannot be discharged unless that sanction is reasonable in view of the circumstances culminating in the strike.

The Court acknowledges, as it must, that it is "bound to accept the interpretation of Wisconsin law by the highest court of the State." *Ante,* at 488. Yet it then proceeds to reverse that court by assuming, as the petitioners urge, that under Wisconsin law the determination to discharge the striking teachers only "involved the [Board's] exercise of its discretion as to what should be done to carry out the duties the law placed on the Board." *Ibid.* It dismisses the respondents' version of Wisconsin law in a footnote. *Ante,* at 490 n. 3.

But the fact is that the Wisconsin Supreme Court has not clearly delineated the state-law criterion that governs the discharge of striking teachers, and this Court is wholly without power to resolve that issue of state law. I would therefore remand this case to the Wisconsin Supreme Court for it to determine whether, on the one hand, the School Board is charged with considering the reasonableness of the strike in light of its own actions, or is, on the other, wholly free, as the Court today assumes, to exercise its discretion in deciding whether to discharge the teachers.

Under the petitioners' view of the Wisconsin law, the discharge determination is purely a policy judgment involving an assessment of the best interest of the school system. Since that judgment does not require the Board to assess its own conduct during the negotiations, and since there is no indication that the Board members have a financial or personal interest in its outcome, the only basis for a claim of partiality rests on the Board's knowledge of the events leading to the strike acquired through its participation in the negotiation process. As

the Court notes, however, "[m]ere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not . . . disqualify a decision-maker." *Ante,* at 493.

But a distinctly different constitutional claim is presented if, as the respondents contend, the School Board members must evaluate their own conduct in determining whether dismissal is a reasonable sanction to impose on the striking teachers. Last Term in *Withrow* v. *Larkin, supra,* the Court noted that "[a]llowing a decisionmaker to review and evaluate his own prior decisions raises problems that are not present" where the bias issue rests exclusively on familiarity with the facts of a case. 421 U. S., at 58 n. 25. Apart from considerations of financial interest or personal hostility, the Court has found that officials "directly involved in making recommendations cannot always have complete objectivity in evaluating them." *Morrissey* v. *Brewer,* 408 U. S. 471, 486. See *Goldberg* v. *Kelly,* 397 U. S. 254.

"[U]nder a realistic appraisal of psychological tendencies and human weakness," *Withrow* v. *Larkin, supra,* at 47, I believe that there is a constitutionally unacceptable danger of bias where school board members are required to assess the reasonableness of their own actions during heated contract negotiations that have culminated in a teachers' strike. If, therefore, the respondents' interpretation of the state law is correct, then I would agree with the Wisconsin Supreme Court that "the board was not an impartial decision maker in a constitutional sense and that the [teachers] were denied due process of law." 66 Wis. 2d 469, 494, 225 N. W. 2d 658, 671.

For the reasons stated, I would vacate the judgment before us and remand this case to the Supreme Court of Wisconsin.