John RUSS, Plaintiff,

v.

Charles R. WHITE, William Southard, James Mosley, Mrs. Guinn Daniel, David Whittington, Gene Parker, Ray Donathan, Mrs. T. J. Collier, Elroy Puckett and Gerald Fisher, Defendants.

No. 78–6041.

United States District Court,
W. D. Arkansas,
Hot Springs Division.

Sept. 25, 1981.

Byron Freeland, Mitchell, Williams & Selig, Little Rock, Ark., for plaintiff.

Richard H. Wootton, Wootton, Land & Matthews, Hot Springs, Ark., for defendants.

MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

This action, filed on October 10, 1978, in the United States District Court for the Western District of Arkansas by Dr. John Russ, seeks the recovery of damages, injunctive relief, and a declaratory judgment. Named as defendants are Gerald Fisher,

President of Garland County Community College, and the nine members of the Board of Trustees for Garland County Community College.

The complaint alleges Dr. Russ was fired from his position as the Dean of Instruction at Garland County Community College (GCCC) in violation of the First and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983. In his complaint, the plaintiff states the defendants unlawfully terminated his contract. He alleges, inter alia:

6. The charges listed in a letter of April 21, 1978, were contrived by Dr. Fisher in a malicious attempt to wrongfully have the plaintiff discharged and to stifle any criticism of the actions of Dr. Fisher in his capacity as President of GCCC. The plaintiff's problems with Dr. Fisher began when he refused to go along with Dr. Fisher's actions in hiring two new employees at the college because of certain statements and actions of Dr. Fisher, which the plaintiff felt were misleading to the Board of Trustees and to the public. The plaintiff told Dr. Fisher that he refused to be responsible for the consequences of hiring the two new employees if Dr. Fisher persisted in following his course of conduct. Dr. Fisher became very angry over the incident, and from that time on began to prepare self-serving, twisted and maliciously untrue, confidential memos about his relationship with the plaintiff. Dr. Fisher placed these memos in the plaintiff's personnel file and later used them as the basis for his recommendation of dismissal. Dr. Fisher's actions were motivated by his unwillingness to tolerate any type of criticism of his office, and to discredit the plaintiff if and when any of the plaintiff's criticism reached the Board of Trustees or the public.

Plaintiff further alleges:

7. On the 20th day of June, 1978, a hearing on Dr. Fisher's recommendation to terminate the contract of the plaintiff was held before the Board of Trustees. Charles White presided over the hearing as Chairman of the Board of Trustees, despite the fact that he had actively advised Dr. Fisher during the controversy and had participated in the drafting of the charges against the plaintiff. In fact, Charles White was directly and personally involved in several of the incidents which were used against the plaintiff. In addition, Charles White had a direct conflict of interest, and should have been disqualified from hearing or participating in the case, as was requested in written motion filed by the plaintiff. Charles White had a conflict in that he is a member of a Hot Springs law firm which has as one of its largest clients Arkansas Bank & Trust. Charles White has a direct business interest in maintaining good relations with the Board of Directors of one of his law firm's major clients. In any event, the business relationship of Charles White and Dr. Fisher creates a suspicion or appearance of bias and impropriety. Defendant, Gene Parker, a Trust Officer of Arkansas Bank & Trust in Hot Springs, has a direct conflict of interest which should compel him to forego participating in any type hearing on the recommendation of Dr. Fisher, a member of the Board of Directors of Mr. Parker's employer. Gene Parker's participation in the hearing places him in an untenable position if he were to vote against the recommendation of Dr. Fisher. Charles White and Gene Parker should have disqualified themselves or been disqualified by the remainder of the Board of Trustees after the plaintiff presented written petitions for their disqualification. The participation of White and Parker in the decision to terminate the plaintiff denied the plaintiff the right to a fair and impartial hearing and amounted to a violation of the plaintiff's right to due process of law as guaranteed by the Fourteenth Amendment to the Constitution of the United States.

8. The real and underlying motive of Gerald Fisher in making the initial recommendation for the termination of the plaintiff's employment contract was Dr. Fisher's desire to silence any criticism of

the college or its administration. The actions of the defendants in terminating the contract of the plaintiff for his criticism of the college and its personnel amount to a violation of the plaintiff's First Amendment right of freedom of speech as guaranteed by the United States Constitution.

Dr. Russ also contends his termination was unconstitutional in that he was denied procedural due process of law:

9. During the hearing before the Board, Charles White as Chairman and with the consent and authorization of the other Board Members repeatedly refused to allow the plaintiff's attorney to cross examine Dr. Fisher concerning the allegations against the plaintiff. The plaintiff was not allowed to inquire into the truth and veracity of Dr. Fisher's testimony, and any questions which were obviously relevant but embarrasing to Dr. Fisher were repeatedly disallowed by Chairman White. When the plaintiff confronted Dr. Fisher at the hearing with a report to the North Central Association that Dr. Fisher had apparently falsified, Chairman White ruled that such cross examination was not relevant to the hearing, although the plaintiff had been accused of questioning Dr. Fisher's honesty. When the Board was presented with the concrete written documentation of falsified accreditation reports it refused to listen although it would tend to show the truth of the accusations for which he was being tried. One of the basic tenants of due process of law is the right to confront and cross examine witnesses, which was completely stifled by Charles White and the other members of the Board.

10. Another basic tenant of due process of law is the right to present witnesses on your behalf. In addition, the policy manuel of the Board of Trustees on page 32 specifically provides that an employee has the right to call any witness on his behalf. The Board refused to allow several of the plaintiff's witnesses to testify about Dr. Fisher's actions or other relevant matters. The plaintiff's witnesses were allowed to testify only to a very few specific topics, which were strictly dictated by the Board, and variance in the testimony discrediting to Dr. Fisher, the plaintiff's chief accuser, was never allowed to be heard.

Jurisdiction is premised upon 28 U.S.C. §§ 1331, 1343(3) and (4), 2201 and 2202.

The action was tried to the Court in June, 1981. Counsel for the parties were given the opportunity to file post-trial briefs. These have been received, and the case is now ready for decision.

## FINDINGS OF FACT

The Garland County Community College is an institution of higher learning created and funded pursuant to the laws of the State of Arkansas. The GCCC was founded in 1973.

GCCC does not offer its employees "tenure" per se, but the college does employ its faculty and staff by contract and during the term of the contract, an employee has an expectation of continued employment unless dismissed for cause.

The Organization Chart of GCCC reveals that the President reports to the Board of Trustees who are elected by the voters in the college district. The four Deans (Dean of Instruction, Dean of Student Services, Dean of Community Affairs, Dean of Financial Administration) report directly to the President. The President, the four Deans, the Registrar, and the Assistant to the President comprise the Administration of GCCC. Each Dean supervises the employees in his area of responsibility.

The President is the chief administrative officer of the institution and the executive officer of the Board of Trustees. Final administrative responsibility for and authority over all activities of the college rests with the President. He is responsible to the Board of Trustees in all matters and serves as a bridge of communication between the Board and the College. The President's duties include the responsibility to nominate faculty and administrative personnel to the

Board of Trustees for employment and termination. Dr. Gerald Fisher, a defendant, has been the President of GCCC since its inception in 1973.

GCCC is a small community college. The administration is small and, by necessity, the administrators must often serve in other capacities and perform other jobs. These range from serving in the unpaid position of Athletic Director to doing maintenance work on the college grounds. By necessity, the administrators must work closely in order for the college to run smoothly and efficiently.

GCCC is overseen by a Board of Trustees which is composed of nine (9) members. In April of 1978 the members of the Board of Trustees were defendants Charles R. White, Chairman; William Southard; James Mosely; Mrs. Guinn Daniel; David Whittington; Gene Parker; Ray Donathan; Mrs. T. J. Collier; and Elroy Puckett.

The Board of Trustees has the authority to terminate an employment contract for cause. GCCC has adopted a grievance procedure which directs an employee with a grievance toward his supervisor for discussion. Final appeal can be made to the Board of Trustees. If an employee is not offered re-employment, or is dismissed for poor or unacceptable performance, the employee may appeal to the Board of Trustees. Under the procedures of GCCC, the employee has the right to be represented by counsel, and has the right to call any witnesses in his behalf.

Plaintiff, Dr. John Russ, was employed by GCCC in 1973 as Dean of Student Affairs. In June, 1974, Dr. Russ was employed to serve on the GCCC administrative staff as Dean of Instruction. Under the direction of the President, the Dean of Instruction coordinates the instructional program and supervises the library. As Dean of Instruction, Dr. Russ supervised the Directors, Division Heads, Department Chairpersons, Faculty, Librarian, and Supportive Staff. The responsibilities delineated in the GCCC Board of Trustees Statement of Policies for the Dean of Instruction include recruiting and recommending faculty to the President, supervising curriculum planning and revision, evaluating instruction, assisting in the planning for new facilities and equipment, recommending faculty promotions and terminations, and approving all expenditures of the Instruction Division. Dr. Fisher, President of GCCC, was the immediate supervisor of Dr. Russ.

Plaintiff signed an employment contract with GCCC on June 22, 1977, for a term of thirty-six (36) months. Again, the position to be filled by Dr. Russ was that of Dean of Instruction. Dr. Russ was to receive an annual compensation of $23,758.00.

Prior to the spring of 1978 and the events which led to the filing of this lawsuit, Dr. John Russ had served GCCC for almost five years. By all reports and evaluations, he had been an excellent administrator and was considered to be an invaluable member of the administration. The events and occurrences which transpired in the early part of 1978 can only be characterized as unfortunate and sad.

In early 1978, Ron Chesser, who had served as the volunteer basketball coach for the college, resigned. Dr. Fisher informed Dr. Russ he intended to hire two physical education teachers who would also coach basketball. They were each to teach five sections of physical education; one was to coach the men's basketball team and the other the women's team.

Dr. Russ disagreed with this decision, feeling the two faculty positions were needed more in other areas of the college. It was his opinion the two positions should be allocated or filled by either nursing instructors or business instructors. Russ candidly expressed his opinion to Fisher.

A search was begun for a physical education instructor/men's basketball coach. Don Harris, the Dean of Community Affairs and Acting Athletic Director, recommended the employment of Edwin "Spriggs" Nutt. Ron Garner, Dean of Student Services, and Dr. Russ did not favor the employment of Nutt. Ron Garner felt he was too much of a "party person" and was not suitable for employment as a coach.

Dr. Russ had been acquainted with Mr. Nutt while they were both at Henderson State University.

While there is sharp conflict in the testimony, the Court finds Dr. Russ did not inform Dr. Fisher or Don Harris of any specific objections to Spriggs Nutt prior to his employment. Rather, Dr. Russ repeatedly stated he had a "gut feeling" that Spriggs Nutt should not be hired. This opinion was also expressed to Don Harris. The testimony of Dr. Fisher that Dr. Russ did not inform him of a specific objection, namely a "test stealing" incident, prior to the recommendation to the Board that Nutt be hired is found to be factual and credible. Dr. Russ, who, along with Don Harris, would supervise the instructor/coach, asked not to be involved in the recommendation of the coach. This was permitted by Dr. Fisher.

Dr. Russ' position on the matter was outlined in a memorandum written to Dr. Fisher on March 20, 1978, and received by him on March 21, 1978:

> I talked with Don Harris last week about the Basketball Program next year and the employment of two coaches/instructors. I initiated the discussion not to introduce any new information but to clarify my position and to discuss some specific things that will need to be done. As I have indicated in previous meetings, my position centers around the following two points:
>
> (1) Given our modest financial situation, I do not feel that a varsity athletic program can be justified at this time. I would strongly support an intramural program available to all students and an expanded physical education curriculum.
>
> (2) I do not support the decision to employ Mr. Edwin Nutt as a coach/instructor. *Because of this decision, I will not accept any responsibility for the quality of his teaching, class attendance, or any area of his instructional employment.* I will, however, assign him the courses you want him to teach. (Emphasis supplied.)
>
> I further recommended to Don that funds be set aside for athletic equipment and supplies and that they be administered by him. I also told him that I feel no need to sell the faculty or persons in the community on my position. I will, however, continue to discuss candidly with you my feelings about this matter.

As is apparent from this memorandum, Dr. Russ had a different philosophy regarding athletics than did the Board of Trustees who had allocated the money for an intercollegiate athletic program.

As a physical education instructor, Spriggs Nutt was to be the responsibility of Dr. Russ. This included responsibility for supervising his teaching, the quality of his teaching, evaluating his performance, his class attendance, coordinating the necessary expenditures for equipment and the need for facilities for physical education. Because of his disagreement with the decision to hire Mr. Nutt, Dr. Russ formally notified Dr. Fisher of his refusal to have any responsibility for Mr. Nutt.

The recommendation to employ Spriggs Nutt as a physical education instructor/coach was approved by the Board of Trustees on March 21, 1978, at its regular meeting. Although the Deans are supposed to attend the Board meetings, Dr. Russ deliberately failed to attend this meeting. By his own admission, he took a day of annual leave because he did not wish to be present when the Spriggs Nutt matter was reached on the agenda.

Dr. Fisher signed the annual leave form. He testified that because the Deans all worked more than forty-hour weeks, he routinely signed any leave form placed before him. The testimony of Dr. Fisher reflects he did not read the leave form and had no indication Dr. Russ intended to miss the Board meeting. Dr. Fisher stated the request for leave was procedurally correct, but that he would have objected had he known of Dr. Russ' intent.

The evidence produced at trial indicates the next four weeks were ones of turmoil, anxiety, tension and concern for the admin-

istration and staff at GCCC. Several incidents and confrontations between Dr. Fisher and Dr. Russ produced an untenable situation for the small administration. All of these incidents were documented by Dr. Fisher. A typed and dated memorandum of each incident was placed in Dr. Russ' personnel file.

On the evening of March 21, 1978, Don Harris requested that a faculty member be in Dr. Russ' office the next morning. Dr. Russ apparently felt this was meant to threaten the faculty member. He became quite angry with Don Harris. Harris characterized Dr. Russ as being belligerent, emotional, and somewhat abusive. By Dr. Russ' own admission, he physically threatened Harris. At 8 a. m. on March 22, 1978, Harris and Russ met in Russ' office. After the meeting Harris was "shaken", according to Dr. Fisher and Don Harris. Harris stated he was bewildered by Dr. Russ' attitude and conduct.

Later that same morning, Dr. Fisher talked with Dr. Russ. According to the memorandum written by Fisher, Dr. Russ' attitude was one of disdain. He stated that Dr. Fisher "had lost his capacity for leadership", and he needed "psychiatric help." Furthermore, Harris had "sold" Fisher on an unsound athletic program, and if he had seen Harris on the previous night he would have attacked him physically. He stated there were several weak staff members, staff members who could not function.

Later that same day, Russ informed Fisher he could continue to function if Fisher would "keep the people who can't function out of his way." He was surrounded by "leeches." All of these statements were admitted by Dr. Russ.

Dr. Fisher's memorandum of March 22, 1978, describes Dr. Russ as being "unwilling to adjust and cooperate if he doesn't get his own way. He is an almost unbelievably bitter person at this point."

On March 24, 1978, Dr. Fisher went to see Charles White, the Chairman of the Board of Trustees, and reviewed the events with Mr. White. He told White that Russ had made serious charges concerning the performance of several administrative staff members, including himself, and had refused to discuss the charges. Dr. Fisher requested that White conduct an investigation.

Dr. Fisher informed Dr. Russ he had spoken with Mr. White. He told Russ he felt that since the two of them had been unable to communicate, Russ should have the opportunity to verbalize his feelings to the Board. Dr. Russ stated he had been called by Mr. White, but that he had no desire to talk with him.

Dr. Fisher described Dr. Russ as being "very angry" throughout this entire period. Dr. Russ admitted he was very angry and emotional. Dr. Fisher testified Russ was in an agitated state. Dean Garner described Russ as being in an enraged state.

Dr. Russ informed Dr. Fisher on March 27, 1978, that he did not trust him and that Fisher had manipulated him.

During this same period of time, Ron Garner, Don Harris, and Dr. Fisher met with Chairman White in his office to discuss the situation. Ron Garner testified he knew the situation was getting extremely bad, and they wished to find some way to help Dr. Russ. Both he and Don Harris testified they were extremely concerned about Dr. Russ and his emotional state.

On Saturday, April 15, 1978, Dr. Russ called Dr. Fisher at his home to ask the location of his personnel file. Dr. Fisher informed him he had it but was about to leave to address a Rotary meeting at De-Gray, Arkansas. Dr. Russ demanded the material, and was told by Fisher it was impossible for him to have it that day. The testimony of Dr. Fisher and his wife, who was on the extension, reflects that Dr. Russ then began an abusive tirade, accusing Dr. Fisher of being immoral, dishonest, and manipulative. He implied Dr. Fisher should commit suicide.

After the regular session of the Board meeting on April 18, 1978, Dr. Russ began shouting at Dr. Fisher in the hallway outside the administrative offices. He demanded his personnel file. He leaned to-

ward Fisher and waived his finger in Fisher's face. He shouted about lack of trust in Fisher. This scene was observed by several people, including Ron Chesser and Frank Steelman. Russ was described by Steelman as being openly hostile, very loud, and calling Fisher names. Chesser testified that Dr. Fisher never raised his voice, and appeared to be trying to conciliate Dr. Russ.

On April 21, 1978, Dr. Fisher recommended to the Board of Trustees that Dr. Russ be terminated. The recommendation was based on information that Russ had:

1. Exhibited behavior inappropriate and unacceptable in a business and professional setting;

2. Made irresponsible and unsubstantiated personal and professional charges against other employees of the college;

3. Failed to meet your responsibilities to the Board by withholding information of alleged wrongdoing by other employees of the college by refusing to communicate with the Board after repeated invitations to do so;

4. Been insubordinate, abusive and disrespectful to the President of the College; and

5. Been indirectly insubordinate to the Board by refusing responsibility for an employee of the Board;

6. That even if allegations and charges against other employees of the college are substantiated, the actions and behavior alone are not and were not appropriate or justified.

Dr. Russ made a timely request for a hearing before the Board of Trustees. The request was granted and a hearing was held on June 20, 1978. At the hearing, Dr. Russ was represented by counsel. The hearing lasted for approximately nine hours.

As a result of the hearing, the Board of Trustees passed the following resolution:

1. This Board finds, following its hearing, and based upon the testimony and evidence presented, that Dr. John Russ has committed wrongful and improper acts disrespectful of the office of the President of this College, to the detriment of this institution, and which would justify this Board taking drastic action;

2. Nevertheless, in view of the high regard in which this Board has previously held Dr. John Russ, because of his important contributions to the academic advancement of the school and its students, and with the thought of avoiding any stigma to Dr. John Russ individually and to his future career;

3. This Board rejects the recommendation that Dr. John Russ' contract be terminated, conditioned upon the following actions being taken:

(A) Dr. John Russ shall publicly and in a written document apologize to the Board for wrongful charges and improper allegations made, and for his disrespectful comduct; and

(B) Dr. John Russ shall promise by written document to this Board that he shall refrain from such comments and actions in the future.

By letter dated August 21, 1978, Dr. Russ informed the Board he could "not retract the substance of the statements. To do so would be a refutation of my value system and self-respect." Dr. Russ was, therefore, terminated on September 9, 1978. The Board specifically found he had been abusive and disrespectful to the President. He had acted in an insubordinate manner to the President and the Board. In its Resolution, the Board stated that "academic freedom was not infringed upon and was not an issue. It does not allow for the expression of opinions or criticism in an abusive, threatening, intimidating, or disrespectful manner."

The record in this case is extensive. The Court, after reading the transcript of the nine-hour Board meeting, reviewing the exhibits and the excellent briefs filed by counsel for the parties, is of the opinion the allegations of Dr. Russ are without merit, and the case must be dismissed.

## CONCLUSIONS OF LAW

The role of this Court is very limited. The record of the hearing before the Board

of Trustees, as well as the evidence introduced at trial, has been examined in order for the Court to determine if the discharge of the plaintiff was based on constitutionally impermissible grounds.

The Court emphasizes that its function in this type of case is very limited. The Court does not review the merits of the University's decision not to rehire Cooper. "[I]t is not our function to evaluate a professor's competence nor to determine whether he any longer fits the needs of a school that is expanding its programs and attempting to upgrade the quality of its faculty. We may not so far involve this court in the discretionary decisions made by state-controlled colleges." *Cook County College Teachers Union, Local 1600 v. Byrd*, 456 F.2d 882, 889 (7th Cir.), cert. denied, 409 U.S. 848, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). See *Megill v. Board of Regents*, 541 F.2d 1073, 1077 (5th Cir. 1976). Rather, the court's only function is to decide the merits of Cooper's constitutional claim, that is, to determine as a factual matter whether he was not reappointed because of his exercise of constitutionally protected rights.

*Cooper v. Ross*, 472 F.Supp. 802, 810 (E.D. Ark.1979).

The first question this Court must address is whether Dr. Russ was terminated for the exercise of his First Amendment rights, i.e., was he terminated for expressing his opinion and criticizing certain policies and personnel of GCCC.

State colleges and universities are not cloistered institutions immune from the First Amendment. *Healy v. James*, 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266 (1972). Teachers do not shed their constitutional right to freedom of speech at the schoolhouse door. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969).

A decision to terminate an administrator who is under contract may be made for good cause. The decision to terminate, however, may not be predicated on the faculty member's exercise of constitutionally

protected rights, particularly the First Amendment guarantee of Freedom of Speech. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 283–284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); *Perry v. Sinderman*, 408 U.S. 593, 597–98, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972); *Shelton v. Tucker*, 364 U.S. 479, 485, 81 S.Ct. 247, 250, 5 L.Ed.2d 231 (1960); *Cooper v. Ross*, supra, at 809.

■ Plaintiff bears the initial burden of establishing that his conduct was constitutionally protected and that this protected conduct was a motivating or substantial factor in the Board's decision to terminate him. If this burden is sustained, the Board must then show by a preponderance of the evidence "that it would have reached the same decision * * * even in the absence of the protected conduct." *Mt. Healthy City School District Board of Education v. Doyle*, supra, 429 U.S. at 287, 97 S.Ct. at 576. The Court concludes that plaintiff has failed to carry his initial burden of proof. He has not shown that his speech and conduct were of the type which are constitutionally protected.

The proof shows that Dr. Russ became angry towards Dr. Fisher and other members of the college staff and that, in the various conferences between the men, Dr. Russ lost his temper and would orally abuse Dr. Fisher. The comments which plaintiff, without dispute, admits making to Dr. Fisher are not the sort of expressions protected by the First Amendment.

[I]t is well understood that the right to free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and of such slight

social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

*Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 768–69, 86 L.Ed. 1031 (1942).

■ An administrator like Dr. Russ does not have the same broad academic freedom as a teacher. In *Hostrop v. Board of Junior College District No. 515*, 337 F.Supp. 977 (N.D.Ill.E.D.1972), the Court concluded in part:

This Court does not think that there need be the same 'vigilant protection' [of constitutional freedoms] when an administrator is involved as may be necessary when a teacher is. The need for teachers to have freedom in what they teach arises from the very heart of the First Amendment. The workshop of the administrator, however, is not the classroom but the office and the conference room. His primary duties are to coordinate, delegate, and regulate, not to educate.

Furthermore:

A college has a right to expect a teacher to follow instructions and to work cooperatively and harmoniously with the head of the department. If one cannot or does not, if one undertakes to seize the authority and prerogatives of the department head, he does not immunize himself against loss of his position simply because his non-cooperation and aggressive conduct are verbalized.

*Chitwood v. Feaster*, 468 F.2d 359, 361 (4th Cir. 1972).

Plaintiff's conduct is similar to that found to exist in *Williams v. Day*, 412 F.Supp. 336 (E.D.Ark.1976). Chief Judge Eisele found that the discharged teacher, when refused the position of athletic director, reacted as follows:

[H]e refused to cooperate with the administration, failed to conform his conduct to the reasonable requirements and standards established by those above him in the administrative hierarchy, and generally shows a lack of personal control and respect for the attitudes and rights of others in the school 'family' which ultimately created an intolerable situation for the athletic director, the principal, the superintendent, and the school board.

*Williams v. Day*, supra, at 340.

In early 1978, in situations arising from routine college administrative matters, Dr. Russ began exhibiting antagonistic and inappropriate behavior towards Dr. Fisher, and began to treat him with disrespect and discourtesy. Despite Dr. Fisher's efforts to alleviate Dr. Russ' bitterness (problems—inappropriate behavior), Dr. Russ continued to exhibit insubordinate, abusive and disrespectful behavior towards Dr. Fisher. Due to Dr. Russ' behavior and his attitude towards Dr. Fisher, his continued employment at GCCC became impossible, and Dr. Fisher, as President, recommended his termination on April 21, 1978.

The evidence clearly reveals that the conflict between Dr. Russ and Dr. Fisher had an adverse effect on the whole staff. It interfered with and interrupted the daily business of the school. The administrative offices became places of great tension and anxiety.

The behavior of Dr. Russ was inappropriate for a business setting. Dr. Russ' statement of his opinion or expression of his feelings on certain matters were not inappropriate, but rather the manner in which they were expressed was characterized by hostility, anger, name calling, and threats of physical violence. This became intolerable and created an untenable situation. This type of behavior and expression of one's opinion is not constitutionally protected. The First Amendment does not immunize an administrator from termination when the speech is accompanied by abuse and threats.

By his own admission and written document, Dr. Russ refused to supervise a faculty member employed in his area of responsibility. This refusal was the direct result of his disagreement to hire the teacher. This was an abdication of his responsibilities and duties as Dean of Instruction. This did not involve the expression of his opinion as to

the matter, but rather the refusal to cooperate with his immediate supervisor and employer. This refusal was the direct result of the acceptance by Dr. Fisher of the opinion of another rather than the opinion of Dr. Russ.

■ Dr. Russ had no constitutionally protected right to express himself in an unbusinesslike and unreasonable manner. He admitted having taken these actions, and publicly expressed his anger, made physical threats towards other people with whom he had to work, and publicly made derogatory comments about his supervisor and other administrative personnel. Dr. Russ was not terminated for the expression of his opinion, but rather the manner in which it was expressed and for his refusal to accept responsibility for a faculty member in his specific area of responsibility.

■ Finding no denial of the plaintiff's First Amendment rights, the Court must next address the issues raised by plaintiff's allegations he was denied procedural due process. These allegations stem from the Board meeting of June 20, 1978, and are as follows:

1) Chairman White should have been disqualified because he had taken part in the investigation and his law firm represents Arkansas Bank & Trust. Dr. Fisher is a member of the Board of Directors of Arkansas Bank & Trust. Therefore, Charles White had a conflict of interest.

2) Board Member Parker should have been disqualified because he is a trust officer at Arkansas Bank & Trust. Dr. Fisher is a member of the Board of Directors of Arkansas Bank & Trust. Therefore, he had a conflict of interest.

3) Chairman White refused to allow certain topics to be explored during the hearing. These topics would have shown the truth of the statements made by plaintiff.

Both White and Parker refused to disqualify themselves from participating in the hearing. At the trial of this matter, both men testified their positions with Arkansas Bank & Trust in no way influenced their decisions. Both stated they were impartial and unbiased.

Plaintiff Russ has merely alleged impropriety and bias the part of the Board members. There has been no demonstration of actual prejudice. "Absent a legal disqualification, the existence of disqualifying prejudice becomes a question of fact." *Petition of Davenport*, 129 Vt. 546, 283 A.2d 452 (1971). The Court finds no prejudice or bias was present. Hence the plaintiff was not denied procedural due process by the denial of the motions to disqualify White and Parker.

The allegation that the refusal of Chairman White to disqualify himself because of his role in the investigation likewise did not result in the denial of due process.

In an administrative proceeding, ... the combination of adjudicating functions with prosecuting or investigating functions will ordinarily not constitute a denial of due process...., and an independent inquiry by a school board prior to a formal hearing is not inconsistent with its power to hold the formal hearing.

*Griggs v. Board of Trustees of Merced Union High School District*, 61 Cal.2d 93, 389 P.2d 722, 726, 37 Cal.Rptr. 194 (1964). In *Williams v. Day*, 553 F.2d 1160, 1164 (8th Cir. 1977), the Circuit Court considered a discharged teacher's contention that he was not afforded an impartial tribunal. The Court in discussing this states:

Even if we assume that such a hearing was mandated by the due process clause, the claim of partiality lacks substance. As the United States Supreme Court noted in *Hortonville Joint School District No. 1 v. Hortonville Educational Ass'n.*, 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976):

Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not, however, disqualify a decisionmaker * * *. Nor is a decisionmaker disqualified simply because he has taken a position, even in public, on a policy issue

related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.' The *Hortonville* case is further instructive. The Supreme Court stated:

A showing that the Board was 'involved' in the events preceding this decision, in light of the important interest in leaving with the Board the power given by the State Legislature, is not enough to overcome the presumption of honesty and integrity in policymakers with decision-making power.

*Hortonville*, supra, 426 U.S. at 496, 96 S.Ct. at 2315.

The Court concludes the plaintiff was not denied procedural due process by the refusal of Chairman White to allow certain topics to be discussed. The purpose of the hearing was to determine whether the conduct of Dr. Russ warranted his termination. Testimony as to the possible misconduct of Dr. Fisher was not relevant. Dr. Russ had ample opportunity to talk with the Board of Trustees prior to the April 21, 1978, letter. He refused to discuss the problems he was having with Dr. Fisher with Chairman White or the Board of Trustees. Furthermore, the hearing dealt in part with his prior refusal to communicate the substance of those charges to the Board or to Dr. Fisher, not with whether he felt justified in making the charges. Dr. Fisher and other staff members were not the subject of the termination hearing.

The Court concludes that the plaintiff was afforded a hearing. The hearing provided the plaintiff Russ with procedural due process. In reaching the conclusion that there was no deprivation of rights, the case must be dismissed.

The findings of fact and conclusions of law are incorporated herein pursuant to Rule 52 of the Federal Rules of Civil Procedure.

A separate order will be entered in accordance with this opinion that the plaintiff has failed to sustain the allegations of his complaint.