694 F.2d 35
 111 L.R.R.M. (BNA) 3149, 7 Ed. Law Rep. 802
 Gloria WOLKENSTEIN, Kathryn Silkes, Philip Rumore and
Vincent Nola, individually and on behalf of all
others similarly situated, Plaintiffs-Appellants,
v.
Eugene T. REVILLE, individually and as Superintendent of
Schools; Claude D. Clapp, individually and as Chief Fiscal
Officer of the City of Buffalo Public School System;
Florence E. Baugh; David Kelly; Joseph E. Murphy; Louis
C. Benton; Joseph D. Hillery; Mozella Richardson; Dennis
Bulera; Oscar Smuckler; John C. Fiorella; as members of
the Board of Education of the City School District of the
City of Buffalo, Defendants-Appellees.
 No. 51, Docket 82-7173.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 16, 1982.
Decided Nov. 18, 1982.
 
 Bruce Fenwick, Buffalo, N.Y. (Robert D. Clearfield, Gen. Counsel, New York Educators Ass'n, Buffalo, N.Y.), for plaintiffs-appellants.
 William E. Carey, Asst. Corp. Counsel, Buffalo, N.Y. (Joseph P. McNamara, Corp. Counsel of the City of Buffalo, Buffalo, N.Y.), for defendants-appellees.
 Robert Abrams, Atty. Gen. of the State of N.Y., Albany, N.Y. (Jeremiah Jochnowitz, Asst. Sol. Gen., and John Q. Driscoll, Asst. Atty. Gen., Albany, N.Y., of counsel), for the Atty. Gen. of the State of N.Y., amicus curiae.
 Before FEINBERG, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This is the latest in a long series of challenges in the state and federal courts over the last decade to the constitutionality of Sec. 210 of New York's Civil Service Law (the Taylor Law), which prohibits strikes by public employees. See Cheeseman v. Carey, 623 F.2d 1387, 1389-90 & note 3 (2 Cir.1980). The action, brought under 42 U.S.C. Sec. 1983 and its jurisdictional counterpart, 28 U.S.C. Sec. 1343(3), in the District Court for the Western District of New York, contests the procedures prescribed by Sec. 210.2 for determining whether a public employee participated in a strike in violation of Sec. 210.1 and for imposing a penalty on those determined to have so participated. The district court granted the named plaintiffs permission to represent a class consisting of "all persons who were penalized by defendants acting pursuant to CSL Sec. 210 owing to their involvement in the teachers' strike that occurred in Buffalo between September 7th and 24th, 1976". Defendants are Eugene T. Reville, individually and as superintendent of Buffalo's schools; Claude D. Clapp, individually and as chief fiscal officer of the Buffalo public school system; and the members of the Board of Education of the City School District of Buffalo. Both sides moved for summary judgment. In somewhat of a dubitante opinion, Judge Elfvin granted the defendants' motion, 539 F.Supp. 87 (1982). This appeal followed.
 
 
 2
 The procedures for determining violations of the Taylor Law and imposing penalties therefor are prescribed by Sec. 210.2, the relevant paragraphs of which we have set out in full in the margin.[1] The "chief executive officer" of the governmental unit involved is empowered to determine, "on the basis of such investigation and affidavits as he may deem appropriate", whether an illegal strike has occurred and which employees have participated. Sec. 210.2(d). In making the latter determination he may employ the presumption, established by Sec. 210.2(b), that an "employee who is absent from work without permission, or who abstains wholly or in part from the full performance of his duties in his normal manner without permission", has participated in the strike. An employee who has been notified that the chief executive officer has found him to have participated in an illegal strike may object to this initial determination by filing a "sworn affidavit, supported by available documentary proof, containing a short and plain statement of the facts upon which he relies ...." Sec. 210.2(h). The chief executive officer evaluates the objections and is obliged to refer those raising material questions of fact to a hearing officer. Id. Between 30 and 90 days after the chief executive officer's initial determination, the "chief fiscal officer" begins payroll deductions of amounts equal to twice the daily rate of pay for each day on strike. These deductions are not stayed until the employee's objection has been sustained, at which time all deductions previously made are refunded. Secs. 210.2(g), (h). The determinations made under Sec. 210.2(h), including the chief executive officer's determination whether an objection raises a material question of fact, are judicially reviewable pursuant to Article 78 of the New York CPLR.
 
 
 3
 The stipulation upon which summary judgment was entered below was, in relevant part, as follows. On September 7, 1976, approximately 3000 of the 3300 school teachers employed by the Buffalo School District commenced a strike which continued through September 24, 1976. By notice dated October 14, 1976, Superintendent of Schools Reville, the district's "chief executive officer", see Sec. 201.10, informed these 3000 teachers that he had found them to have participated in an illegal strike. Approximately 400 teachers, including the four named plaintiffs,[2] filed objections. Some 325 of these, again including the named plaintiffs, received notices, signed by Reville, dismissing their objections and denying a hearing on the ground that they had failed to establish that they had not participated or to raise a question of fact as to their participation. Several of those who were thus denied a hearing availed themselves of the opportunity provided by Sec. 210.2(h) to challenge Reville's determination in an Article 78 proceeding; the Supreme Court of New York directed that hearings be held in three such cases. The payroll deductions made by Deputy Superintendent Clapp, the district's "chief fiscal officer", totalled some $6 million, all of which was applied to the school district's operating budget. Finally, it was stipulated that Reville and Clapp were "involved in the formation of the budget and the planning with regard to the utilization" of the $6 million.
 
 
 4
 On the basis of this stipulation plaintiffs sought below a declaration that the procedures in Sec. 210.2 deprived them of their property without due process of law. They made two claims. The first was that Reville, given his various executive responsibilities for the school system's operation and budget, has a disqualifying interest in the determinations he makes under Sec. 210.2(h). The second was that the procedures are infirm on their face for failure to provide hearings prior to the commencement of payroll deductions. The first claim was rejected by the district court, not without evident misgivings, on the basis of a prior decision of this court.[3] The second claim was found to be settled authoritatively against plaintiffs by the Supreme Court's dismissal of the appeal from Sanford v. Rockefeller, 35 N.Y.2d 547, 364 N.Y.S.2d 450, 324 N.E.2d 113 (1974), "for want of a substantial federal question", 421 U.S. 973, 95 S.Ct. 1972, 44 L.Ed.2d 465 (1975).
 
 
 5
 Since plaintiffs have not renewed their second claim, the sole question for review is whether in authorizing Superintendent Reville to pass on the legal sufficiency of objections, Sec. 210.2(h) transgresses the command, rooted in common law practice, see Bonham's Case, 8 Co. 107a, 77 Eng.Rep. 638 (K.B.1608); 2 Cooley, Constitutional Limitations 870-75 (8th ed. 1927), and considered to be inherent in the due process clause of the 14th amendment, see In re Murchison, 349 U.S. 133, 137, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), that no person shall be judge in a case in the outcome of which he has an interest. The constitutional contours of that command have been most fully explored in a quintet of Supreme Court decisions: Tumey v. Ohio, 273 U.S. 519, 47 S.Ct. 437, 71 L.Ed. 749 (1927); Dugan v. Ohio, 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928); Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); Hortonville Joint School District No. 1 v. Hortonville Educational Ass'n, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976); and Marshall v. Jerrico, Inc., 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). Although none is conclusive of the precise question before us, we must look to these decisions in seeking a resolution.
 
 
 6
 Tumey, Dugan and Ward were criminal cases involving Ohio "Mayors' Courts". In Tumey the defendant had been convicted of violating the state's prohibition act after a trial before the mayor of North College Hill in the Village's "Liquor Court". Pursuant to state statute, half of the fines assessed in this court were retained by the Village. These funds were used partly to compensate the deputy marshals and detectives who secured evidence and the prosecutors who secured convictions, 273 U.S. at 518-19, 47 S.Ct. at 439-40, and partly for general "village improvements and repairs", id. at 521, 47 S.Ct. at 440. The Village ordinance establishing the Liquor Court further provided that the mayor receive "his costs in each case, in addition to his regular salary, as compensation for hearing such cases", id. at 519, 47 S.Ct. at 440; however, no costs were paid to him unless the defendant was convicted. During a seven-month period in 1923 some $11,000 in fines redounded to the Village--this amounted to $10 per Village resident--and some $696 came to the mayor as costs in addition to his regular salary. Id. at 521-22, 47 S.Ct. at 440-441. The scheme was held to violate due process on two grounds--first, because the mayor, "as an individual", had a "direct, personal, pecuniary interest" in the costs which he received from convictions, id. at 523, 531-35, 47 S.Ct. at 441, 444-45; second, because the mayor, as the Village's chief executive, charged with the business of looking after its finances, had a strong "official motive to convict and to graduate the fine to help the financial needs of the village", id. at 535, 47 S.Ct. at 445.
 
 
 7
 A limitation on the second ground of Tumey was shortly set in Dugan v. Ohio, supra, 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 written, as Tumey had been, by Chief Justice Taft. The defendant there had been convicted by the mayor of the city of Xenia for a state liquor offense. Since the mayor was a salaried official who did not participate in the costs collected or fines imposed by his court, the first ground of Tumey was inapplicable. Despite the fact that, as in Tumey, half of the fines imposed were retained by the city, the second ground was held inapplicable as well. The reason was that unlike the mayor of North College Hill, who "as chief executive was responsible for the financial condition of the village" and who thus "might be tempted to accumulate from heavy fines a large fund by which the running expenses of a small village could be paid, improvements might be made, and taxes reduced," id. at 65, 48 S.Ct. at 440, the mayor of Xenia had no executive functions. Xenia had a commission form of government; the mayor was only one of five commissioners, while the "active executive" was the city manager. Id. at 63, 48 S.Ct. at 439. The Court concluded that the mayor's "relation under the Xenia charter, as one of five members of the city commission, to the fund contributed to by his fines as judge, or to the executive or financial policy of the city" was too "remote" to create a practical conflict of interest. Id. at 65, 48 S.Ct. at 440. This was said despite the fact that ultimate responsibility for raising the city's revenues, as for spending them, see id. at 62, 48 S.Ct. at 439, presumably rested with the commission rather than the city manager.
 
 
 8
 Ward v. Village of Monroeville, supra, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 was held to fall within the second ground of Tumey rather than under Dugan. This was for two reasons. First, the village of Monroeville, like North College Hill, had a traditional form of municipal government in which the mayor had "wide executive powers" and exercised "general overall supervision of village affairs", id. at 58, 93 S.Ct. at 82. Second, Monroeville, like North College Hill, derived a "major part" of its income from the fines and fees imposed by the mayor's court--ranging from 37% to 50% in the five years cited, id. at 58, 93 S.Ct. at 82. Indeed, so vital was the revenue generated by the mayor's court that "when the state legislature threatened its loss, Monroeville retained a management consultant for advice upon the problem", id. at 58-59 and n. 1, 93 S.Ct. at 82-83 and n. 1.
 
 
 9
 Hortonville, supra, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1, like the instant case, dealt not with criminal proceedings but with the disciplining of teachers who had struck in violation of state law. The discipline, there dismissal rather than mere fine, was administered, however, not by the Hortonville school district's superintendent but by its elected seven-member School Board, which had engaged in the pre-strike negotiations with the teachers and had sole statutory authority to hire and fire. The Court rejected the dismissed teachers' due process challenge to the Board's impartiality. Leaving open the question whether Tumey and Ward "state the governing standards when the decisionmaker is a public employer dealing with employees", it held that "the teachers did not show, and the Wisconsin courts did not find, that the Board members had the kind of personal or financial stake in the decision that might create a conflict of interest ...." Id. at 491, 96 S.Ct. at 2313. However, the decision is less telling for defendants in our case than the statement up to this point might seem to make it. The Board had engaged, the Court pointedly noted, not in adjudication--the dismissed teachers all admitted that they had struck--but in policy-making, to wit, determining whether dismissal or some less drastic measure, such as mediation or continued bargaining, would best serve the interests of the school system and the taxpayers. Id. at 494-95, 96 S.Ct. at 2314-15.[4] To such a decision the stringent standards of Tumey and Ward simply did not apply.[5]
 
 
 10
 The Court's most recent extended discussion of the impartiality requirement is Marshall v. Jerrico, Inc., supra, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182. At issue there was the constitutionality of Sec. 16(e) of the Fair Labor Standards Act, 29 U.S.C. Sec. 216(e), under which sums collected as civil penalties for the unlawful employment of child labor are returned to the Employment Standards Administration (ESA) of the Department of Labor in reimbursement for the costs incurred by its assistant regional administrators ("administrators") in determining violations and assessing penalties. The Court unanimously rejected the claim that this statutory scheme impermissibly encouraged the administrators to make unduly numerous and large assessments. It held that the "rigid requirements of Tumey and Ward, designed for officials performing judicial or quasi-judicial functions", id. 446 U.S. at 248, 100 S.Ct. at 1616, are inapplicable to the ESA's administrators whose function of assessing violations is "akin to that of a prosecutor or civil plaintiff" rather than a judge, id. at 247, 100 S.Ct. at 1615.[6] Beyond this the Court found that the reimbursement scheme does not offend the more relaxed standard applicable to "administrative prosecutors". The administrators are salaried officials who in no way profit personally from the assessments they make. Since the sums collected were very small--"substantially less" than 1% of the ESA's budget in the three years examined, and less than the amounts returned to the Treasury by the ESA in each of these years--there was no "realistic possibility" that the judgment of the administrators would be "distorted by the prospect of institutional gain ...". Id. at 250, 100 S.Ct. at 1617. Moreover, the ESA's administration of Sec. 16(e) had minimized the potential for bias. In the one year in which the ESA elected to allocate part of the civil penalties to the regional offices rather than retain the entirety in the national office, it did so in proportion to the expenses incurred in investigating and prosecuting violations not in proportion to the amount of penalties actually collected. This being so, an administrator could not expect to benefit his own regional office by imposing large penalties. Id. at 251, 100 S.Ct. at 1617.
 
 
 11
 We are thus left with a case not so strong for unconstitutionality as Tumey and Ward, and not so strong for constitutionality as Hortonville or Jerrico. Although Dugan v. Ohio, supra, 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784, surely is not directly on point, District Judge Leval may well have been right in thinking that decision, which stands in the middle of the continuum, to be a better guide for decision here than any of the other cases, see O'Brien v. Board of Education, 498 F.Supp. 1033, 1036 (S.D.N.Y.1980). We hold that, for the reasons that follow, plaintiffs have not made out their claim.
 
 
 12
 We begin with the proposition that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation", Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Whether a particular decisionmaking procedure is constitutionally defective for want of impartiality will depend on many factors, among which are the character of the decision being made, see Jerrico, supra, 446 U.S. at 247-49, 100 S.Ct. at 1615-16, the nature of the individual and governmental interests at stake, see Hortonville, supra, 426 U.S. at 491, 96 S.Ct. at 2313, and the feasibility of alternative procedures. See, e.g., Lopez v. Henry Phipps Plaza South, Inc., 498 F.2d 937, 943-44 (2 Cir.1974) (manager of a publicly assisted housing project not so "management oriented" as to be disqualified from presiding over eviction hearing involving another project owned by the same federally funded landlord); Powell v. Ward, 542 F.2d 101 (2 Cir.1976) (prison official with direct responsibility for institutional security not disqualified solely by reason of his position from adjudicating allegations of breaches of prison security).
 
 
 13
 In the instant case the decisions which Superintendent Reville made under Sec. 210.2(h) were neither "prosecutorial", compare Jerrico, nor "governmental", compare Hortonville, but adjudicative, and adjudicative in a very special sense. In evaluating the objections filed by the teachers Reville was deciding the purely legal question whether the excuse alleged for absence was sufficient as a matter of law. As our review of the authorities has shown, due process demands strict impartiality on the part of those who function in a judicial or quasi-judicial capacity. Nevertheless, the Court has made clear on several occasions that administrators serving as adjudicators are presumed to be unbiased. See, e.g., United States v. Morgan, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1949); Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); Schweiker v. McClure, --- U.S. ----, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982). This presumption can be rebutted by a showing of disqualifying interest, either pecuniary, see Gibson v. Berryhill, 411 U.S. 564, 578-79, 93 S.Ct. 1689, 1697-1698, 36 L.Ed.2d 488 (1973), or institutional, see Ward, supra, or both, see Tumey, supra. But the burden of establishing a disqualifying interest rests on the party making the assertion. Schweiker v. McClure, supra, --- U.S. at ----, 102 S.Ct. at 1670.
 
 
 14
 Fairly read, neither the facts stipulated to below nor the generalized assertions made here about Reville's "inconsistent" responsibilities, prove an interest on his part in the outcome of the determinations made under Sec. 210.2(h) sufficient, under the Supreme Court's standards, to overcome the "presumption of honesty and integrity," Withrow v. Larkin, supra, 421 U.S. at 47, 95 S.Ct. at 1464, that attaches by virtue of his office. Even if the "rigid requirements" of Tumey and Ward were thought applicable to administrative adjudication in the public employment context, a question, as we noted previously, expressly left open in Hortonville, supra, 426 U.S. at 491, 96 S.Ct. at 2313, plaintiffs simply have failed to show that Reville's situation is "one which would offer a possible temptation to the average man as a judge", Tumey, supra, 273 U.S. at 532, 47 S.Ct. at 444; Ward, supra, 409 U.S. at 60, 93 S.Ct. at 83; Murchison, supra, 349 U.S. at 136, 75 S.Ct. at 625, to deny hearings to teachers whose objections were legally sufficient.
 
 
 15
 Plaintiffs do not contend that Reville has a "direct, personal, pecuniary interest" in the determinations he makes under Sec. 210.2(h) of the sort found in Tumey.[7] Plaintiffs' contention is rather that because Reville has a strong "official motive", Tumey, supra, 273 U.S. at 535, 47 S.Ct. at 445, to maximize the amount of penalties collected, the case falls within the second ground of Tumey. We find the contention unpersuasive for several reasons.
 
 
 16
 Unlike the mayors in Tumey and Ward, Reville is not responsible for seeing to it that the money needed to run Buffalo's schools is provided; that responsibility rests with the Mayor and Common Council. Plaintiffs refer vaguely to Reville's participation in the budgetary process, but they nowhere furnish details as to the precise part he takes. Common sense, confirmed by contemporaneous newspaper accounts of the school strike, attached as exhibits to defendants' motion to dismiss, see n. 9, infra, and by the district court's researches, see 539 F.Supp. at 97, suggests that he prepares a proposed budget, but that his responsibility ends with preparing and defending it. Although the Superintendent has broad powers and duties, see N.Y. Education Law Sec. 2566, it is the School Board, not he, who submits budgetary requests to the Mayor and Common Council. See 539 F.Supp. at 97. See also N.Y. Education Law Sec. 2576. So far as the record shows, then, Reville is a public servant whose interest is only in running a successful operation for which elected officials must find the money. It cannot seriously be supposed that such an official would make unjustified determinations under Sec. 210.2(h) simply to secure an increment in revenue for his district or to ingratiate himself with the Board and the taxpayers. For one thing, a superintendent's success depends in the long run[8] on many factors, not the least of which is the steady good will and support of his teachers. For another, Reville doubtless knew full well that the means of correcting any wrong decision on his part were readily at hand--in immediate Article 78 review. A record of frequent reversals would hardly further Reville's career.
 
 
 17
 In both Tumey and Ward the Court put great emphasis on the fact that the revenues generated by the Mayor's Court were very substantial and vitally important to the village's fiscal well being. See Tumey, supra, 273 U.S. at 521, 47 S.Ct. at 440; Ward, supra, 409 U.S. at 58-59, 93 S.Ct. at 82-83. These mayor's courts were ongoing institutions, doubtless prized by the local taxpayers, the purpose of which was as much to raise revenue as to enforce the state's liquor laws. The contrast with the instant case is plain enough. Neither in intent nor operation do the strike-penalty provisions of the Taylor Law serve primarily, or even significantly, to raise revenues; their evident purpose is to deter strikes by public employees. The imposition of penalties is sporadic and occasional--as sporadic and occasional as the strikes themselves. More important, the particular sums at stake in this case were hardly substantial enough to turn Reville's head. Of the $6 million stipulated to have been collected from the 3,000 striking teachers, only about $600,000 came from the 325 teachers whose objections were dismissed by Reville as insufficient on their face. See 539 F.Supp. at 95 n. 4. This sum represents little more than half of one percent of the School Board's more than $100,000,000 budget for the 1976-77 fiscal year. The great disparity between this percentage and that in Ward, where the fines assessed in the Mayor's Court ran from one-third to one-half of the village's revenues, is not without constitutional significance. See Jerrico, supra, 446 U.S. at 245, 250-51, 100 S.Ct. at 1614, 1617-1618.[9]
 
 
 18
 An added reason for our conclusion is the nature of the determination made by Reville and the remedy provided for any error. In each of the 325 cases in which Reville dismissed objections without a hearing, he made a determination of law, namely, that taking the objector's affidavit and supporting proof to be true, the excuse proffered was insufficient. An objector dissatisfied with such a ruling had immediate recourse to an Article 78 proceeding, where the standard of review would be precisely the same as that applied by Reville in the first instance. See CPLR 7803(3) and Sanford v. Rockefeller, 35 N.Y.2d 547, 364 N.Y.S.2d 450, 454-56, 324 N.E.2d 113 (1974), appeal dismissed for want of a substantial federal question, 421 U.S. 973, 95 S.Ct. 1972, 44 L.Ed.2d 465 (1975). Here, as indicated, as a result of Article 78 review hearings were directed to be held in three cases. See also Zarella v. Koch, 74 App.Div.2d 749, 425 N.Y.S.2d 582 (App.Div., 1st Dept.1980) (affidavit of civil service employee, which stated that he telephoned to find out if he should report to work and was told that his plant was not operating, was sufficient to raise a question of fact requiring that a hearing office be appointed); St. Pierre v. Board of Education, 40 App.Div.2d 71, 337 N.Y.S.2d 706 (App.Div., 3d Dept.1972) (affidavits stating that employees reported for work at the customary time on day of strike and performed all usual duties until normal departure time were sufficient to require appointment of hearing officer). Under Sec. 210.2(h), then, an employee who believes himself entitled to a hearing on the question of his strike participation has two bites at the apple. If the chief executive officer dismisses his objection without a hearing, he can immediately request the state court to pass on the legal sufficiency of his objection. The interposition of the chief executive officer between the employee and the state courts serves the important state interest of relieving the latter of the need to evaluate the legal sufficiency of each and every objection filed, many of which are palpably without basis. We are, of course, mindful of the ruling in Ward v. Village of Monroeville, supra, 409 U.S. at 61-62, 93 S.Ct. at 83-84, that the availability of a trial de novo before an unbiased judge did not remove the constitutional infirmity in an original trial before one whose impartiality was impaired, since a litigant "is entitled to a neutral and detached judge in the first instance." But we are by no means sure that this ruling, made in a criminal case, applies to the decision of a school administrator on a point of law which is subject to prompt, full, and inexpensive judicial review. Be that as it may, the preceding discussion has shown that plaintiffs here in fact received a neutral evaluation of their objections in the first instance.
 
 
 19
 In sum, while New York, if only to avoid litigation on facts more persuasive than those here, might be well advised to commit the initial evaluation of the legal sufficiency of objections to some other administrator lower in the administrative hierarchy than the chief executive officer, these plaintiffs have demonstrated no violation of their federal constitutional rights, and summary judgment for defendants was properly entered.
 
 
 20
 Affirmed.
 
 
 
 [1]
 (d) Determination. In the event that it appears that a violation of this subdivision may have occurred, the chief executive officer of the government involved shall, on the basis of such investigation and affidavits as he may deem appropriate, determine whether or not such violation has occurred and the date or dates of such violation. If the chief executive officer determines that such violation has occurred, he shall further determine, on the basis of such further investigation and affidavits as he may deem appropriate, the names of employees who committed such violation and the date or dates thereof. Such determination shall not be deemed to be final until the completion of the procedures provided for in this subdivision
 (e) Notice. The chief executive officer shall forthwith notify each employee that he has been found to have committed such violation the date or dates thereof and of his right to object to such determination pursuant to paragraph (h) of this subdivision; he shall also notify the chief fiscal officer of the names of all such employees and of the total number of days, or part thereof, on which it has been determined that such violation occurred. Notice to each employee shall be by personal service or by certified mail to his last address filed by him with his employer.
 (g) Payroll Deductions. Not earlier than thirty nor later than ninety days following the date of such determination, the chief fiscal officer of the government involved shall deduct from the compensation of each such public employee an amount equal to twice his daily rate of pay for each day or part thereof that it was determined that he had violated this subdivision; such rate of pay to be computed as of the time of such violation. In computing such deduction, credit shall be allowed for amounts already withheld from such employee's compensation on account of his absence from work or other withholding of services on such day or days. In computing the aforesaid thirty to ninety day period of time following the determination of a violation pursuant to subdivision (d) of paragraph two of this section and where the employee's annual compensation is paid over a period of time which is less than fifty-two weeks, that period of time between the last day of the last payroll period of the employment term in which the violation occurred and the first day of the first payroll period of the next succeeding employment term shall be disregarded and not counted.
 (h) Objections and restoration. Any employee determined to have violated this subdivision may object to such determination by filing with the chief executive officer, (within twenty days of the date on which notice was served or mailed to him pursuant to paragraph (e) of this subdivision) his sworn affidavit, supported by available documentary proof, containing a short and plain statement of the facts upon which he relies to show that such determination was incorrect. Such affidavit shall be subject to the penalties of perjury. If the chief executive officer shall determine that the affidavit and supporting proof establishes that the employee did not violate this subdivision, he shall sustain the objection. If the chief executive officer shall determine that the affidavit and supporting proof fails to establish that the employee did not violate this subdivision, he shall dismiss the objection and so notify the employee. If the chief executive officer shall determine that the affidavit and supporting proof raises a question of fact which, if resolved in favor of the employee, would establish that the employee did not violate this subdivision, he shall appoint a hearing officer to determine whether in fact the employee did violate this subdivision after a hearing at which such employee shall bear the burden of proof. If the hearing officer shall determine that the employee failed to establish that he did not violate this subdivision, the chief executive officer shall so notify the employee. If the chief executive officer sustains an objection or the hearing officer determines on a preponderance of the evidence that such employee did not violate this subdivision, the chief executive officer shall forthwith restore to the employee the tenure suspended pursuant to paragraph (f) of this subdivision, and notify the chief fiscal officer who shall thereupon cease all further deductions and refund any deductions previously made pursuant to this subdivision. The determinations provided in this paragraph shall be reviewable pursuant to article seventy-eight of the civil practice law and rules.
 
 
 [2]
 Each of the objections filed by named plaintiffs Wolkenstein, Silkes, and Rumore consists in good part of what appears to be a form affidavit, alleging, inter alia, that the employee's absence was caused by the provocative actions of the Board of Education. The record on appeal contains none of the other 400 or so objections filed
 
 
 [3]
 The district judge considered himself bound by our decision in Kornit v. Board of Education, 591 F.2d 1330 (2 Cir.1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1281, 59 L.Ed.2d 495 (1979), which sustained Sec. 210.2(h) against a claim of the sort raised here. The decision in Kornit, however, was rendered in an unpublished opinion. As such it is subject to our local rule Sec. 0.23 which denies precedential status to summary orders. It could be argued that this rule should not be applied with full rigor to an order, like that in Kornit, which affirmed "substantially for the reasons stated by [the district judge]". Be that as it may, we do not rely on Kornit here but consider the matter afresh
 
 
 [4]
 Since the dismissed teachers conceded their participation in the strike, "there was no possibility of an erroneous factual determination on this critical threshold issue," id. 426 U.S. at 494, 96 S.Ct. at 2314. The Board's decision to dismiss the teachers was "only incidentally a disciplinary decision; it had significant governmental and public policy dimensions as well." id. at 495, 96 S.Ct. at 2315. In our case, in contrast, plaintiffs have not all admitted engaging in the 1976 strike; moreover, it is precisely this "critical threshold issue" which Sec. 210.2(h) commits to Superintendent Reville's initial determination. Further, the imposition of penalties under Sec. 210.2 involves no discretionary considerations whatever; the penalties flow automatically from Reville's finding of strike participation
 
 
 [5]
 Hortonville also rejected a claim of bias with respect to the policy decision based on the Board members' participation in the negotiations prior to the strike, which allegedly made it impossible for them to deal fairly with the question of remedy. This portion of the decision is not relevant here since the Taylor Law mandates the deduction for any public employee who was on strike
 
 
 [6]
 An employer against whom a penalty is assessed has the statutory right to a de novo hearing before an ALJ. It is the latter, not the assistant regional administrator, the Court found, who performs the function of "adjudicating" child labor violations
 
 
 [7]
 Plaintiffs were well advised not to claim this. Superintendent Reville, like the mayor in Dugan, is a salaried official who in no way participates in the penalties collected under the Taylor Law. We cannot divine any indirect pecuniary interest Reville had or could be thought to have had in maximizing the penalties imposed. There is no allegation or proof that his compensation as superintendent varied inversely with the amounts paid to the teachers or that he would be likely to be rewarded for zeal in imposing penalties by a salary raise. One can, of course, suppose that Reville might fare better in an easy rather than a tight budgetary situation, but in that respect he seems not very different from the mayor in Dugan
 
 
 [8]
 The school superintendent in a district like Buffalo can afford to take the long view. He holds his position for a term of six years during which he cannot be removed save for cause. N.Y. Education Law Sec. 2565
 
 
 [9]
 We do not mean to suggest that $600,000 is a trifling sum even for a city of Buffalo's size. We are well aware that in times of severe fiscal stress a loss of $600,000 may force painful cutbacks in one school program or another. But the plaintiffs provide no information with which to assess the precise marginal utility of the $600,000 collected here. The stipulation says only that all of it "was applied by defendants with regard to the operating budget and expenses of the District." However, newspaper accounts of the strike, attached as exhibits to defendants' motion to dismiss the complaint, seem to indicate that the moneys were used to restore kindergarten and bus transportation programs--programs which had been sharply cut by the Board in an austerity budget which Reville, two months before the strike, had characterized as "totally inadequate". Further, Judge Elfvin's independent investigations revealed that the Board's supplemental budget request for 1976-77, the year of the strike, was a good deal smaller than in either the preceding or subsequent year, 539 F.Supp. at 98. The plaintiffs, however, have made nothing of this either here or in the district court. Their claim relies only on the barebones stipulation of facts summarized above and certain general propositions about Reville's various executive responsibilities. In determining whether they have overcome the presumption that Reville is impartial, we necessarily confine ourselves to the claims plaintiffs have actually raised