761 F.Supp. 1398 (1991)
ROLLA CABLE SYSTEM, INC., Plaintiff,
v.
CITY OF ROLLA, Defendant.
No. 89-2101C(2).
United States District Court, E.D. Missouri, E.D.
April 15, 1991.
*1399 *1400 *1401 R. Lawrence Ward, Philip W. Bledsoe, Shughart, Thomson & Kilroy, Kansas City, Mo., and Anthony J. Sestric, Sestric & Cipolla, St. Louis, Mo., for plaintiff.
Thomas M. Utterback, William A. Hellmich, Weier, Hockensmith & Sherby, St. Louis, Mo., for defendant.

MEMORANDUM
FILIPPINE, Chief Judge.
This matter is before the Court on appeal from the franchising authority's decision denying the franchise renewal of Rolla Cable System, Inc. (RCS).

INTRODUCTION
RCS is a cable operator.[1] The City of Rolla, acting through its City Council, is considered a franchising authority because it is a governmental entity empowered to grant a franchise.[2] On March 13, 1961, RCS was granted an exclusive thirty year franchise to operate a cable television system in Rolla, Missouri.[3] On July 19, 1988, RCS requested that the City of Rolla (City) begin negotiations to renew its franchise.[4] On September 12, 1988, the Rolla City Council (Council) authorized City Administrator Merle Strouse to make contact with cable television consultants to give the City assistance in negotiations. On December 13, 1988, the Council appointed Attorney Thomas Utterback as a consultant for cable television issues. On the same day, the Council formally appointed Strouse, Utterback, City Attorney John D. Wiggins, council member Ruth Neher, and Mayor Floyd Ferrell to a committee which was to consider the cable television issue.
RCS indicates that the Committee formed on December 13 never met to consider the cable television issue. Instead, RCS maintains that without any express authorization from the Council, a "new" cable T.V. committee (Cable Committee) was thereafter formed which assumed authority to conduct all subsequent cable-related hearings. The Cable Committee included: council members Neher, Marvin Busch, Lester Moore, and Don Stevens; and, community members Jeffrey Stoll, Dr. Don Hackman, Egilina Rafnson, Evelyn Baker, and Robert Eck. John Twitty, Jr., and Merle Strouse served on the Cable Committee as ex officio members.
The Court cannot determine from the record when the Cable Committee was formed. What is clear, however, is that the Cable Committee was merely advisory. The Council retained full authority to grant or deny the RCS's proposal for renewal.
On January 3, 1989, the Council passed an ordinance prohibiting private contact by cable television companies with city officials or elected representatives. On March 23, 1989, the Cable Committee held a public hearing to identify the future cable-related community needs and interests, and to review the performance of RCS. Thereafter, a preliminary determination was made not to renew RCS's franchise. The Council requested that RCS submit a renewal proposal and RCS complied with that request on May 5, 1989.[5] On May 16 and June 19, 1989, public hearings were held on the renewal proposal. The Cable Committee presided over the hearings. The City Council and the Mayor attended the evidentiary hearings, as the hearings were convened as official Council meetings. On August 14, 1989, the City Council denied the application of RCS for renewal of its franchise. The City's decision is set out in ordinance # 2694.

CLAIMS
In Count I, RCS contends that the City's findings of fact and conclusions of law *1402 were not properly based upon the factors set out in 47 U.S.C. § 546(c)(1) of the Cable Communications and Policy Act of 1984 (Communications Act).
In Count II, RCS complains that the renewal proceeding was conducted by an unfair and biased decision maker.
In Count III, RCS appeals the decision of the franchise authority because the decision was not supported by a preponderance of evidence.
In Count IV, RCS maintains that the City failed to provide it with proper notice and a full and fair opportunity to participate in the renewal proceeding.
On September 20, 1990, this Court determined that the issues raised in Counts I, III and IV would be considered on the record. 745 F.Supp. 574. As to Count II, the Court indicated that an expanded review might be warranted under the circumstances. Therefore, the Court requested that the parties brief Count II separately. The Court permitted plaintiff to go beyond "the record," if necessary.

CABLE COMMUNICATIONS AND POLICY ACT OF 1984
Before considering the merits of RCS's claims, the Court will provide an overview of the Communications Act. One of the purposes for the Communications Act is to "establish an orderly process for franchise renewal which protects cable operators against unfair denials of renewal where the operator's past performance and proposal for future performance meet the standards established by the [Communications Act]." 47 U.S.C. § 521(5).
The procedure for renewal is contained in 47 U.S.C. § 546. That section provides for a three stage renewal process which starts during a six-month period which begins with the thirty-sixth month before the franchise expiration. In this first stage, "the franchising authority may on its own initiative, and shall at the request of the cable operator, commence proceedings which afford the public in the franchise area appropriate notice and participation for the purpose of  (1) identifying the future cable-related community needs and interests; and (2) reviewing the performance of the cable operator under the franchise during the then current franchise term." 47 U.S.C. § 546(a).
In the second stage, which takes place after the public hearing, "a cable operator seeking renewal of a franchise may, on its own initiative or at the request of a franchising authority, submit a proposal for renewal." 47 U.S.C. § 546(b)(1). If the franchising authority decides to renew, the renewal procedure comes to a close. If, however, the franchise authority makes a preliminary assessment not to renew then, at the request of the operator or on its own initiative, the franchising authority shall commence an administrative proceeding to consider whether 
(A) the cable operator has substantially complied with the material terms of the existing franchise and with the applicable law;
(B) the quality of the operator's service, including signal quality, response to consumer complaints, and billing practices, but without regard to the mix, quality, or level of cable services or other services provided over the system, has been reasonable in light of community needs;
(C) the operator has the financial, legal, and technical ability to provide the services, facilities, and equipment as set forth in the operator's proposal; and
(D) the operator's proposal is reasonable to meet the future cable-related community needs and interests, taking into account the cost of meeting such needs and interests.
47 U.S.C. § 546(c)(1).[6]
At the completion of the proceeding, the franchising authority issues a written decision *1403 granting or denying the proposal for renewal and states the reasons therefor. The decision must be based upon the record of the proceeding and a copy of the decision provided to the cable operator.[7]
Pursuant to the record of the proceeding, the denial of renewal must be based on an adverse finding with respect to the factors listed in subsections 546(c)(1)(A) through (D); however, the franchising authority may not base a denial of renewal on the factors listed in (c)(1)(A) and (B) for events that occur after December 29, 1984, "unless the franchising authority has provided the operator with notice and the opportunity to cure, or in any case in which it is documented that the franchising authority has waived its right to object, or has effectively acquiesced." 47 U.S.C. § 546(d).
"Any cable operator adversely affected by any final determination made by a franchising authority under section 545 or 546 of this title [the Communications Act] may commence an action within 120 days after receiving notice of such determination, which may be brought in  (1) the district court of the United States for any judicial district in which the cable system is located; or (2) in any State court of general jurisdiction having jurisdiction over the parties." 47 U.S.C. § 555.
The Court shall grant appropriate relief if it finds that:
(A) any action of the franchising authority is not in compliance with the procedural requirements of this section; or
(B) in the event of a final decision of the franchising authority denying the renewal proposal, the operator has demonstrated that the adverse finding of the franchising authority with respect to each of the factors described in subparagraphs (A) through (D) of subsection (c)(1) of this section on which the denial is based is not supported by a preponderance of the evidence, based on the record of the proceeding conducted under subsection (c) of this section.
47 U.S.C. § 546(e)(2).

DENIAL OF DUE PROCESS
RCS contends that it was not given a fair administrative hearing because Twitty had an institutional pecuniary interest in the outcome of the renewal proceeding and Utterback, Moore, council member Fred Krueger, Stoll, and Strouse prejudged the issues of the renewal proceeding. Based on comments made by Utterback, Moore, Krueger, Stoll, and Strouse, RCS maintains that the Cable Committee reached a decision on the merits of the hearing before any evidence was presented.[8] The City of Rolla contends that RCS waived its right to appeal on bias or prejudice grounds because those matters were not raised before the franchise authority.
In reviewing the question of bias and prejudice, it should be remembered that by the time an administrative hearing is conducted on a cable operator's renewal request, the franchising authority has already made an initial determination not to renew. Therefore, by the administrative hearing stage, the franchising authority is to that extent predisposed against renewing the cable operator's franchise. Congress sought to minimize the effect of this "predisposition" by specifically limiting the allowable reasons for non-renewal and requiring that the administrative proceedings be conducted on the record.[9]
In order for the procedural safeguards of the Communications Act to work effectively, the franchising authority must *1404 provide the cable operator with an opportunity, within reasonable limits, to submit all evidence in support of its renewal request. Otherwise, an appropriate record will not be established for a reviewing Court. Also, no member of the franchising authority can have a personal or institutional financial interest in the outcome of a decision "which would offer a possible temptation to the average man as a judge." See Wolkenstein v. Reville, 694 F.2d 35, 42 (2d Cir.1982) (citations omitted), cert. denied 462 U.S. 1105, 103 S.Ct. 2452, 77 L.Ed.2d 1332 (1983).
Of the individuals that RCS asserts were prejudiced against its renewal request, only Moore and Krueger were actually members of the franchising authority. Utterback served as a consultant and Stoll and Strouse were members of the Cable Committee which only made recommendations to the Council. Under the circumstances here, the Council members attended all the evidentiary hearings and made a ruling based on the record. Given these facts, the Court finds that, even if the Committee and the consultant were as biased as RCS alleges, they did not so taint the decision of the franchising authority so as to implicate due process concerns. Nonetheless, to clarify the record, the Court will consider all of RCS's claims of bias and prejudice  even those directed at Utterback, Twitty, Stoll and Strouse. But first, the Court will consider the City's argument that RCS waived its right to appeal the decision of the franchising authority based on bias or prejudice grounds.

A. Waiver
The City argues that RCS did not timely raise the issue of bias and prejudice. In support of that position the City directs this Court to the Federal Administrative Procedure Act (APA), §§ 500-576. The City asserts that Section 556(b) of the APA applies to the administrative proceeding conducted by the franchising authority. See 5 U.S.C. § 554 (1978). In pertinent part, 5 U.S.C. § 556(b) (1990) reads:
On the filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification of a presiding or participating employee, the agency shall determine the matter as a part of the record and decision in the case.
RCS asserts that 5 U.S.C. § 556(b) does not apply because under the Communications Act it had 120 days to appeal the decision of the franchising authority and, if Section 556(b) is interpreted to limit that 120 period, it violates the mandate of the APA that sections 551-59 of Title 5 of the United States Code do not limit or repeal additional requirements imposed by statute.[10]
Section 556(b) does not limit the 120 day appeal period. If a party raises a bias or prejudice argument as soon as practicable after he has reasonable cause to believe that grounds for disqualification exist, the matter may be raised on appeal provided that an appeal is filed within 120 days of the final decision of the franchising authority.[11] It is only when a party fails to raise a particular issue when required to do so that he is barred from bringing that matter on appeal. Thus, it can be properly said that when a party fails to raise a bias or prejudice argument in a timely manner the party's own inaction, not Section 556(b), works to limit those matters that can be raised on appeal.
Here, there are at least three good reasons to apply the "waiver rule." First, when a party voices his misgivings in a tardy fashion, time and effort may be wasted in the event that disqualification is ultimately granted. Second, it would be inequitable to allow a party to "suppress his misgivings while waiting anxiously to see whether the decision goes in his favor." *1405 Marcus, 548 F.2d at 1050. Third, in most instances, by requiring a party to raise a claim of bias or prejudice as soon as practicable, the franchising authority is given the first opportunity to consider the issue. If the franchising authority rejects the bias or prejudice argument, the claimant could establish a record for a reviewing court. An expanded review would only be required if the franchising authority refused to hear certain evidence on a particular issue[12] or if the question of bias or prejudice surfaced after the franchising authority issued its findings of fact and conclusions of law.[13]

B. Moore
On March 23, 1989, Moore, who was elected to the Council in April 1989, announced that RCS was not giving the City a good cable system at a reasonable cost. He therefore suggested that RCS be replaced with another company or the City itself operate a cable TV system for its citizens. If RCS believed Moore's comments raised due process concerns, it should have immediately brought the matter to the franchising authority's attention; and its failure to do so amounts to a waiver.
Even if RCS had brought Moore's comment to the attention of the franchising authority, disqualification would not have been necessary. There is no indication that Moore had a personal or institutional financial interest in the outcome of the renewal proceeding. Moreover, his comment came almost a year after RCS's initial renewal proposal was rejected and ten days after the first administrative hearing.[14] The type of prejudgment reflected in his comments naturally flows from the renewal procedure set up by Congress. Had Congress wanted complete neutrality, it could have required that a neutral third-party conduct that renewal proceedings after a franchising authority initially rejected a renewal request. Therefore, RCS is not entitled to relief in Count II based on Moore's participation in the administrative proceeding.

C. Krueger
On July 10, 1989, the Cable Committee requested and was granted by the Council an extension of time in which to file its final report and recommendation. Krueger commented that the Cable Committee members had enough time to make a decision. He noted that the decision was preconceived anyway and that there was no point in waiting for an answer.
It appears from Krueger's comments that by July 10, 1989, he had made up his mind RCS's franchise should not be renewed and opposed the delay that would result from granting the Cable Committee additional time. His comments came after the conclusion of the evidentiary hearings and were not disqualifying. Moreover, there is no indication that he had a personal or institutional financial interest in the outcome of the decision.
RCS also complains about certain comments made by Krueger to Mr. Robert Schloss at a public hearing in the spring of 1988. Mr. Schloss is part owner of Omega Communications, Inc. (Omega), which owns RCS. Essentially, Krueger indicated that either RCS lied about making certain improvements on its cable system or the improvements made by RCS were a waste of money. If RCS believed Krueger was biased against it in 1988, it should have filed an affidavit and requested that Krueger abstain from deciding on the renewal request. RCS's failure to do so bars it from raising the issue of Krueger's bias on appeal.

D. Utterback
RCS first complains that Utterback should not have served as the City's advocate. RCS believes that comments made *1406 by Utterback on the day he was hired and on April 10, 1989, exhibited his prejudice against RCS's renewal proposal. At the December 13, 1988, meeting, Utterback expressed concern over whether the City could grant an exclusive franchise without a vote by the people, recommended that the Council consider the possibility of a municipally-owned system, and suggested that an in-depth technical assessment of the system be undertaken because the system had problems. RCS also takes exception to comments made by Utterback on April 10, 1989. On that day, Utterback indicated that the RCS's system was mediocre to poor and that the facts gathered to that point did not speak well for RCS.
The question of Utterback's perceived prejudice should have been brought to the franchise authority's attention sometime in April, 1989. RCS's failure to raise the issue of Utterback's potential prejudgment of the issues in a timely fashion amounts to a waiver. Nonetheless, even if RCS did not waive its right to complain about Utterback's participation in the proceedings, the claim is without merit. Utterback had no personal or institutional financial interest in the outcome of the franchising authority's decision. His comments on December 13, 1988, merely reflect that he did some research on the cable communication situation not that he prejudged the issues. As to the comments on April 10, 1989, Utterback stressed that it was important to give RCS every due process consideration.

E. Stoll
RCS indicates that Stoll expressed his bias or prejudice in the spring of 1988 at a forum sponsored by RCS to discuss cable issues. At the forum, Stoll asked RCS how it could be trusted to do what is good, proper, and right for the citizens of Rolla. Thereafter, in March, 1989, Stoll accused the cable company of using technical rationalizations to hide their reluctance to invest in better equipment. Finally, on July 6, 1989, Stoll said: "I am biased against the Rolla Cable Company."
The Court will make four comments in connection with the charge of bias and prejudice against Stoll. First, Stoll was not on the City Council and, thus, was not a decision maker. Second, if RCS thought Stoll was biased against it in early 1988, the matter should have been brought to the franchising authority's attention as soon as RCS learned that Stoll would be involved in the renewal process. Because RCS did not bring this matter to the franchising authority' attention, it waived the right to bring it now. Third, RCS does not assert that Stoll had a personal or institutional financial interest in the outcome of the franchising authority's decision. Finally, the only comment which clearly reflects that Stoll judged the facts was his statement made on July 6, 1989. That statement was made after the hearings were concluded and during the Cable Committee's deliberations. Although the Cable Committee asked for additional financial information from RCS in July of 1989, Stoll had heard most of the evidence before making the statement. Under the circumstances, the Court rejects RCS's due process argument concerning Stoll's participation on the Cable Committee.

F. Twitty
RCS asserts that Twitty should not have served on the Cable Committee because he was director of Rolla Municipal Utilities (RMU). RMU is city owned and submitted a bid to become the Cable Operator for the City of Rolla.[15] Although RCS may have known during the early stages of the renewal process that the City might opt for municipal ownership, it is unclear when RCS became aware that RMU would submit a bid. Therefore, the Court finds that RCS did not delay in acting upon information that Twitty might be biased against its renewal proposal.
RCS's claim of bias against Twitty is premised on the fact that RMU submitted a bid for the next cable system in Rolla. RCS believes that Twitty had an institutional *1407 pecuniary interest in the outcome of the renewal proceeding because "RMU would have been better off if it would have become the cable provider for the City of Rolla." Accepting this reasoning, the whole Council would have to disqualify itself because it would be "better off" if the City became the cable operator. The only problem with that logic is that Congress expressly allows the franchising authority to own an interest in a cable system.[16]
In determining whether there is bias, a certain balance is required. Twitty has no personal bias and no more of an institutional bias than the Council itself. Further, this man had the expertise to explain the technical aspects of the matters presented to the Council. Although the Court recognizes that Twitty's opinion certainly would have been respected, he nevertheless was not a member of the Council nor even a voting member of the Committee. Under the circumstances, the participation of Twitty in the renewal proceeding does not implicate due process concerns.

G. Strouse
On January 10, 1991, Strouse made a statement to a radio station that:
three years ago, or roughly three years ago, we [the City] decided that they [RCS] were not the firm we wanted to negotiate with in the future because of past experiences we have had with them. Under the 1984 Cable Act, we were able to notify them we no longer wanted their services.
Although RCS did not claim that Strouse had a personal financial interest in the renewal proceeding, the Court was troubled by this comment because by January, 1988, RCS had not yet requested the City begin negotiations to renew its franchise. Therefore, the Court requested that Strouse testify concerning his comment to the radio station.[17]
The Court finds credible Strouse's explanation that his comment reflected the attitude of the City just prior to the time that it made the initial decision not to renew; namely, that it did not want RCS providing cable service to Rolla. The City properly informed RCS of its initial decision not to renew the franchise and then, as required by the Communications Act, the franchising authority conducted an administrative hearing. Strouse had no personal or institutional financial interest in the outcome of the renewal procedure; and, because his comment merely reflected the attitude of the City as is revealed by the procedures it undertook, RCS is not entitled to relief on this point.

H. Refusal To Hear Certain Evidence
RCS also argues that the City's prejudgment was evidenced by the franchising authority's refusal to consider some of RCS's evidence in support of its renewal request. At the May 16, 1989, hearing, Utterback objected to the introduction of testimony from satisfied customers of RCS. The objection was withdrawn and, with the agreement of counsel from RCS, those individuals who were satisfied with RCS's service stated their names and addresses for the record. Therefore, RCS's argument on this point is without merit.

I. Conclusion on Bias and Prejudice Issue
Viewing the question of bias and prejudice in light of the legislative scheme provided for in the Communications Act, RCS was provided with a fair decision maker and a fair advisory committee. The decision maker was not completely neutral; but, Congress did not draft the Communications Act with complete neutrality in mind. The franchising authority was responsible for monitoring RCS's service, and it had to respond to consumer criticism long before the renewal procedure began. The familiarity of the franchising authority with the cable operator's service puts the franchising authority in the best position to gauge the renewal request, and that is why *1408 Congress relegated the renewal decision to it  not a neutral third party.

DID THE FRANCHISING AUTHORITY PROPERLY BASE THE DENIAL OF THE RENEWAL ON THE FACTORS LISTED IN 47 U.S.C. § 546(c)(1)
With respect to the factors listed in 47 U.S.C. § 546(c)(1), the City denied RCS's renewal under subsections (A), (B), and (C). As to subsection (c)(1)(A), the City concluded that RCS failed to comply with "the primary material terms of the franchise, i.e., providing reasonable picture quality and service." As to the factors listed in subsection (c)(1)(B), the franchising authority found that "the overall quality of Rolla Cable System service, its response to customer complaints and billing practices, [and] the Company's performance has been unreasonable in light of community needs. In particular, the St. Louis Channels have been unwatchable for the period of time that the system has been receiving the same, and that consistent and unwarranted interference in other channels has occurred." Finally, as to the criteria set forth in (c)(1)(C), the City found that, although RCS had the financial resources and legal ability to provide services, facilities and equipment, it did not have the technical ability to provide them. The City found that RCS "has continually and consistently mismanaged the system in light of substantial community criticism and has done so primarily because of its inability to understand and/or commit to technical competence."[18]

A. Findings with respect to 47 U.S.C. § 546(c)(1)(A) and (B)
RCS indicates that the City improperly based its denial on factors listed in subsection (c)(1)(A) and (B) because RCS was not given specific written notice and an opportunity to cure as provided by Section 546(d). That Section provides in relevant part:
A franchising authority may not base a denial of renewal on a failure to substantially comply with the material terms of the franchise under subsection (c)(1)(A) of this section or on events considered under subsection (c)(1)(B) of this section in any case in which a violation of the franchise or the events considered under subsection (c)(1)(B) of this section occur after the effective date of this subchapter unless the franchising authority has provided the operator with notice and the opportunity to cure, or in any case in which it is documented that the franchising authority has waived its right to object, or has effectively acquiesced.[19]
47 U.S.C. § 546(d) (emphasis added).
The City contends that it was not required to give "specific written notice" to RCS because the company received actual or implied notice of the poor signal quality and consumer problems, and that was sufficient to satisfy the "notice" requirement of the Communications Act.[20] The City indicates that RCS was put on notice in the following ways: on January 6, 1983, Martin, then City Administrator of Rolla, wrote to Schloss and encouraged him to proceed *1409 with system improvements; on August 22, 1983, Martin wrote to Schloss and indicated that there was a "move afoot" to revoke the franchise of RCS because of the poor quality of the picture reception and numerous service problems that people experienced;[21] On August 30, 1985, Council member Gladys Light wrote to Schloss and indicated that she and her constituents were displeased with the poor service provided by RCS; on January 25, 1985, Martin wrote to Schloss and indicated that customers were upset over a rate increase and the poor cable reception; on December 18, 1987, Strouse, who succeeded Martin as City Administrator, wrote to Doris Barton, the local manager of RCS, and indicated that Schloss should hire the best possible expert to solve the technical problems that RCS was having with reception of the channels originating in St. Louis; and in the spring of 1988, RCS (with the aid of the City) organized a public hearing to discuss citizen complaints. At the hearing, complaints were made pertaining to poor reception and service.
The Court finds that the communications listed above were not sufficient, for purposes of the Communications Act, to put RCS on notice of problems with picture quality and service was poor. A plain reading of subsection 546(d) requires that the franchising authority put the cable operator on "notice" of problems with respect to subsections (c)(1)(A) and (B). This requirement assures that a cable operator knows what the decision maker, not a third party, considers wrong with the cable service.
In addition to the requirement that the franchising authority express its views directly, it should also be specific in its explanation of the problem or problems which it believes warrant nonrenewal under subsections (c)(1)(A) and/or (B). If the explanation of the problem is not specific enough, then the opportunity to cure becomes meaningless. For example, a complaint that customer service is poor is too vague; the cable operator must know the reason why the service is poor to enable it to remedy the situation.[22] Although it is preferable that the franchising authority express its views in writing, such is not required, provided that the franchising authority discloses to the cable operator its position and that position is expressed with specificity.
Of the communications which the City indicates put RCS on notice that problems existed which could serve as a basis for nonrenewal under subsections (c)(1)(A) or (B), most came from the City Administrator of Rolla, who, as indicated above, was not a member of the franchising authority. The letter from Light was not specific enough, and the Mayor's complaint came prior to a time the cable system was rebuilt. If the Mayor was still dissatisfied with the signal quality of the cable system after the rebuilding was completed, he should have called a Council meeting to discuss the matter. If the Council agreed with the Mayor, which it appears it did, the Council should have officially notified RCS of the problem.
The Court finds that the franchising authority failed to properly inform RCS of the problems with respect to poor signal quality and consumer problems. As such, the franchising authority's findings with respect to (c)(1)(A) and (B) cannot serve as a basis for nonrenewal because the franchising authority did not comply with the requirements of subsection 546(d).

B. Findings with respect to 47 U.S.C. § 546(c)(1)(C)
In order to deny a renewal request under subsection (c)(1)(C), the franchising authority must find that the cable operator does not have "the financial, legal, and *1410 technical ability to provide the services, facilities, and equipment as set forth in the operator's proposal." With respect to 47 U.S.C. 546(c)(1)(C), the City found that:
Rolla Cable Systems, Inc., likely has the financial resources and legal ability to provide services, facilities and equipment. However, the City of Rolla further finds that there is no factual base to determine that Rolla Cable System has the continuing technical ability to provide said services, facilities and equipment. In particular, and in specific, the City finds that Rolla Cable System, Inc., has continually and consistently mismanaged the system in light of substantial community criticism and has done so primarily because of its inability to understand and/or commit to technical competence.
RCS makes two arguments against sustaining the City's decision not to renew based subsection (c)(1)(C). First, RCS contends that the City did not explicitly find that the cable operator does not have the technical ability to provide the services, facilities, and equipment as provided for in its renewal proposal. Second, RCS argues that even if the City found that the company did not have the technical competence to provide the service set forth in the renewal proposal the finding was not supported by a preponderance of the evidence.
The conclusion of law quoted above is poorly drafted and does not reference the renewal proposal. Nevertheless, it is clear from the conclusion, especially when viewed in light of the various findings, that the franchising authority determined that RCS lacked the technical ability to provide the service it proposed.
The franchising authority supports its conclusion with respect to (c)(1)(C) with the following evidence: testimony by Mr. Charles J. Martin, a consulting engineer hired by the City, that RCS's technical staff is not competent to properly run the cable system in Rolla and senior management of RCS has shown no ability to commit to technical competence; testimony by Mr. Frank Michael Gyovai, a building inspector for Rolla, that some grounding work done by RCS to bring the system in compliance with the 1987 National Electric Code was done improperly; and the fact the RCS has proposed an "untried and unreviewed system design" which could substantially increase the number of amplifiers, which in turn could increase noise.
Initially, RCS indicates that the City improperly relied on RCS's past performance in reaching a conclusion not to renew under subsection (c)(1)(C). In particular, RCS complains that Martin's comments were based on the past performance of the company's service, not its ability to perform under the renewal proposal. In deciding upon the issue of technical competence, the past performance of a company is highly relevant and may be considered in reaching a decision on technical ability. Therefore, the franchising authority properly considered evidence of past performance in reaching its conclusion on technical competence.
RCS, in support of its position that it has the ability to provide the service set forth in the renewal proposal, cited to testimony by James Kearney, an engineering consultant, that RCS's employees received training through a correspondence course made available by the National Cable Television System. RCS also indicates that it showed technical competence by properly balancing the system, installing additional test points, and correctly grounding its system.
The Court has undertaken an exhaustive review of the joint record and, although there is some conflict in the evidence concerning whether RCS properly grounded its system, the Court is satisfied that the franchising authority's decision under subsection (c)(1)(C) is supported by a preponderance of the evidence.
Having found that the action of the franchising authority was in compliance with the procedural requirement of the Communication Act and that its findings and conclusions under subsection 546(c)(1)(C) were supported by a preponderance of the evidence, Rolla Cable System, Inc.'s request for relief under 47 U.S.C. § 546(d) is denied.
An appropriate judgment shall accompany this memorandum.

*1411 JUDGMENT
In accordance with the memorandum filed this date,
IT IS HEREBY ORDERED and ADJUDGED that defendant, City of Rolla, shall have judgment against plaintiff, Rolla Cable System, Inc., and that plaintiff's civil action to review the decision of the franchising authority is DISMISSED with prejudice.
NOTES
[1] See 47 U.S.C. § 522(4).
[2] See 47 U.S.C. 522(9).
[3] As indicated in this Court's Order of September 20, 1990, the question of whether RCS was acting under a valid franchise when it requested that its franchise be renewed has no relevance to this appeal.
[4] The request was made pursuant to the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521-547.
[5] See 47 U.S.C. § 546(b).
[6] In any proceeding under 47 U.S.C. § 546(c)(1), "the cable operator shall be afforded adequate notice and the cable operator and the franchise authority, or its designee, shall be afforded fair opportunity for full participation, including the right to introduce evidence (including evidence related to issues raised in the proceeding under [47 U.S.C. § 546(a)]), to require the production of evidence, and to question witnesses. A transcript shall be made of any such proceeding." 47 U.S.C. § 546(c)(2).
[7] 47 U.S.C. § 546(c)(3).
[8] The City, by way of a motion to strike, objected to this Court's consideration of newspaper articles submitted by RCS. The motion to strike was denied by this Court because the City's motion was not in compliance with Local Rule 7(B). The City did not resubmit its motion to strike and the Court will consider the newspaper articles.
[9] "Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not ... disqualify a decisionmaker.... Nor is a decisionmaker disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not `capable of judging a particular controversy fairly on the basis of its own circumstances.'" Hortonville Joint School Dist. v. Hortonville Education Ass'n, 426 U.S. 482, 493-94, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976).
[10] See 5 U.S.C. § 559.
[11] "The general rule governing disqualification, normally applicable to the federal judiciary and administrative agencies alike, requires that such claim be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist. It will not do for a claimant to suppress his misgivings while waiting anxiously to see whether the decision goes in his favor. A contrary rule would only countenance and encourage unacceptable inefficiency in the administrative process." Marcus v. Director, Office of Workers' Compensation Programs, 548 F.2d 1044, 1051 (D.C.Cir.1976) (footnotes omitted).
[12] Under the Missouri Administrative Procedure Act, Chapter 536 of the Revised Statutes of Missouri, a reasonable opportunity is given for a party to present evidence on the issue of bias. See Mo.Rev.Stat. § 536.063 (1986); State ex rel. Brown v. City of O'Fallon, 728 S.W.2d 595, 596-97 (Mo.App.1987).
[13] See 47 U.S.C. § 546(c)(2)(A).
[14] There is some question as to whether Moore attended the March 13, 1989, hearing; however, all the Council meetings were recorded on magnetic tapes.
[15] The City Counsel has now opted against the idea of a municipally owned cable television system; that decision, however, which occurred after the decision not to renew RCS's cable franchise, has no bearing on the present appeal and will not be considered.
[16] Under the Communications Act, "a State or franchising authority may hold any ownership interest in any cable system." 47 U.S.C. § 533(e)(1).
[17] RCS has requested an evidentiary hearing on Count II. Except for the limited testimony from Strouse, the Court finds that such a hearing is not required, nor would it prove beneficial.
[18] The franchising authority found that the proposal promulgated by RCS is reasonable to meet the future cable-related community needs and interests, taking into account the costs of meeting such needs and interests.
[19] There is no evidence that the City waived its right to object, or has effectively acquiesced to the problems found with respect to the factors listed in 47 U.S.C. § 546(c)(1)(A) or (B).
[20] The City contends that because the Cable Act does not indicate how the cable operator should be put on "notice" of problems with respect to the factors listed in 47 U.S.C. § 546(c)(1)(A) or (B) this Court should look to state law to determine the matter. In support of this position, the City cites the case of Eastern Telecom Corp. v. East Conemaugh, 872 F.2d 30, 34 (3d Cir. 1989). In that case, the Court considered the issue of how a date is established for the submission of a renewal proposal under the Communications Act. Although 47 U.S.C. § 546(b)(3) refers to the establishment of date by which a renewal proposal shall be submitted, it does not specify the formalities of setting such a date. In Eastern Telecom, the Court held that when the Cable Act refers to action by the franchising authority, without specifying the formalities required for such action, state law governs.

Here, the issue is not whether the cable operator is put on notice; rather, the question is whether the franchising authority put the cable operator on notice.
[21] Martin's letter actually refers to a discussion that he and Mayor Ferrell had with Schloss in the early summer of 1983. Apparently, during those discussions, Schloss committed to rebuild RCS within one year. Martin asked to be kept up to date on the progress of the rebuilding and suggested that RCS make a public announcement on the rebuilding. Thereafter, there were numerous communications between the City and RCS on the rebuilding issue.
[22] According to the franchise authority's findings, RCS has proposed a proper and adequate customer complaints procedure as part of the franchise renewal proposal.